IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WALTER GOUDY,　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　Plaintiff,　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　vs.　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
RODNEY J. CUMMINGS,　　　　　　　　　）
in his individual capacities as a　　　　　　）
Anderson police detective and as　　　　　　）
a Madison County prosecutor,　　　　　　　）
STEVE NAPIER, in his individual capacity　　）
as an Anderson police detective,　　　　　　）
CITY OF ANDERSON, an Indiana municipality,　）
THE STATE OF INDIANA (for indemnification　）
purposes only)　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　Defendants.　　　　　　　）

1:12 -cv- 0161 TWP -TAB

## COMPLAINT

### Introduction

1. On February 5, 1994, the Plaintiff was wrongfully arrested by Defendants Rodney Cummings and Steve Napier, Anderson police detectives.

2. That same month, Madison County Prosecutor William Lawler Jr. filed murder and attempt murder charges against the Plaintiff in Case Number 48D03-9502-CF-042 ("the original case,"), and the Plaintiff spent almost three months in the Madison County Jail for a crime he did not commit before being released from custody on May 16, 1994.

3. Cummings, the lead detective on the case, proximately caused the Plaintiff to be

1

falsely arrested and charged, and maliciously prosecuted for this murder due to Cummings' misconduct, as described in this complaint.

4.  Cummings later ran for elected office, and further caused the Plaintiff to be falsely re-charged in case 48D03-9504-CF-000110 ("the re-filed case") for the same original murder and the Plaintiff was thus re-arrested on April 11, 1995, and thereafter Cummings continued his malicious and unconstitutional prosecution of the Plaintiff, causing him to be falsely convicted and sent to prison for a crime he did not commit.

5.  The Plaintiff was released from prison on September 1, 2010, after the Seventh Circuit Court of Appeals, in *Goudy v. Basinger*, 604 F.3d 394 (7th Cir. 2010), granted the Plaintiff's *habeas corpus* petition on May 3, 2010, and gave the State 120 days to re-try the Plaintiff or free him from custody.

6.  The Seventh Circuit granted the Plaintiff's *habeas corpus* petition based on a violation of the Plaintiff's Constitutional rights to be made aware of the existence of exculpatory and/or impeaching material, and the Court ruled this withheld evidence created a reasonable probability that the Plaintiff would not have been convicted had this material been tendered to the Plaintiff and his attorney before trial.

7.  Cummings and his Anderson police detective partner, Steve Napier, was responsible (although the Plaintiffs are not necessarily at this point limiting liability to only these two individuals) for withholding all of the evidence described in the *Goudy* opinion, and in this complaint, in violation of the Plaintiff's rights guaranteed by the United States Constitution.

8.  The re-filed criminal case against the Plaintiff was dismissed by a special prosecutor on January 13, 2012, in favor of the Plaintiff.

9.  The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. §
    1983, § 1988, the judicial code 28 U.S.C. § 1331 and § 1343(a); the Constitution of
    the United States, Indiana law, and pendent jurisdiction, as provided under U.S.C. §
    1367(a).

10. Upon information and belief, the Defendants reside or are located within in the
    jurisdictional limits of the Southern District of Indiana.

11. The Plaintiff currently resides in the United States, outside the State of Indiana.

12. In total, the Plaintiff spent nearly 16 years of his life in prison as a result of the actions
    of the Defendants.

13. In addition to his loss of liberty, the Plaintiff lost his job and future employment
    opportunities, the Plaintiff suffered extreme emotional and physical injuries,
    pecuniary loss, and the loss of his society and companionship with his friends and
    family, including the Plaintiff's two daughters, who were not even born yet at the
    time he was first arrested.

14. The Plaintiff now seeks substantial compensation, totaling in the millions of dollars,
    for the extreme past, present, and permanent injuries the Plaintiff suffered as a result
    of the actions of the Defendants.

**Parties**

15. The Plaintiff is 43 years old, and was 25 years old when he was first arrested in this
    case.

16. The Plaintiff now resides in the United States, outside the State of Indiana.

17. Rodney J. Cummings is sued in his individual capacities.

18. Cummings is sued, in part, in his individual capacity when he was the lead detective

in this case, acting within the course and scope of his employment with Defendants City of Anderson, Indiana.

19. Cummings also is sued, in part, in his individual capacity after, in 1994, he ran for and was elected the Madison County Prosecutor and then continued his malicious and unconstitutional actions described in this complaint.

20. Cummings, after being elected prosecutor, used his prosecutorial office to get a case filed that no reasonable prosecutor would have ever filed, especially had they known about the exculpatory and/or impeaching evidence that Cummings continued to hide from the Plaintiff and his attorney, and he did so in continuation of the misconduct he began when he was the lead police detective in this case.

21. Cummings also acted in an investigatory capacity as a prosecutor in taking the investigatory actions described in this complaint.

22. As an Anderson police detective, *inter alia*, Cummings and Napier created unduly suggestive line-up procedures, maliciously prosecuted and/or caused false charges to be placed against the Plaintiff, and withheld exculpatory and/or impeaching evidence from the Plaintiff and his attorney, all of which is described with more specificity in this complaint.

23. As a prosecutor, Cummings maliciously prosecuted the Plaintiff, continued to withhold exculpatory and/or impeaching evidence and/or conspired with police and/or prosecutors to withhold such evidence from the Plaintiff and his attorney, and he withheld evidence of a key witness testifying pursuant to a deal he made with that witness, all of which is described more fully in this complaint.

24. Anderson Police Detective Steve Napier was Cummings' partner, and is sued in his

4

individual capacity.

25. At all times relevant to this complaint, Napier acted under color of law, and within the course and scope of his employment with the City of Anderson.

26. Additionally and/or alternatively, Cummings and/or Napier entered into a conspiracy, and/or multiple conspiracies with other police officers and/or with other prosecutors to withhold the exculpatory and/or impeaching evidence described in this complaint from the Plaintiff and his attorney.

27. At the time of the occurrences, Defendant City of Anderson was a municipal corporation, and the principal employer of Defendants Cummings and Napier, who were acting under color of law and in the scope of their employment with Defendant City of Anderson as duly sworn police detectives.

28. Defendant City of Anderson is being sued on an indemnification theory only for all judgments, costs, and attorney's fees that may be awarded to the Plaintiff and or his attorneys, and is also sued on the theory of *respondeat superior* on the Plaintiff's state law claims.

29. Defendant State of Indiana is being sued on an indemnification theory only because, under Indiana law, the State is required to pay for not only Cummings' defense insofar as he is being sued for the period of time when he was a Madison County Prosecutor, but also for any judgments, costs, and attorney's fees that may be awarded to the Plaintiff and/or his attorneys.

**Facts**

30. During the early morning hours of October 2, 1993, Marvin McCloud was shot while he was driving his vehicle near Seventeenth Street and Madison Avenue in Anderson,

Indiana.

31. McCloud's injuries were fatal and he died that same date.

32. Damon Nunn was in the front passenger seat, and Jill Barclay was in the back passenger seat in McCloud's car at the time of the shooting.

33. The Plaintiff did not shoot McCloud, nor was he involved in the shooting in any manner.

34. In fact, the Plaintiff was hosting a party in his home in Indianapolis, about 40 miles from Anderson, at the time for the shooting.

35. The Plaintiff had several alibi witnesses to back up his claim, many of whom testified during the Plaintiff's trial.

36. On February 5, 1994, Cummings willfully and wantonly created and/or participated in an unnecessary and unduly suggestive one-man "show up" of the Plaintiff that Cummings and Napier knew would lead to false identifications of the Plaintiff, and which did, in fact, lead to false identifications of the Plaintiff.

37. This show-up was the result of Cummings and Napier asking Jill Barclay and her cousin, Carlotta Barclay, both witnesses to the shooting, to come down to the Anderson police station to identify a suspect in custody.

38. Cummings and Napier told Jill Barclay that the police had a suspect in custody for the McCloud murder, and asked Jill Barclay to look at that person to determine if she recognized him.

39. Cummings and Napier told Jill Barclay to look through a one-way mirror, Jill Barclay did so, and then she subsequently identified the Plaintiff as being involved in the shooting, by looking through that one-way mirror at a time when the Plaintiff was the

6

only person in that room.

40. One-person show ups are inherently suggestive, and are consistent with Constitutional principles only in limited circumstances.

41. The one-person show up procedure, especially combined with the fact that Cummings and Napier told Jill Barclay that they had a suspect in custody, was inherently suggestive and unduly so since there was no legitimate reason to tell Barclay that the police had a suspect in custody, and they had no legitimate reason to conduct a one-person show-up rather than a multiple person physical line-up.

42. Thereafter, Cummings and Napier conducted a physical line-up, which included the Plaintiff and five inmates from Madison County Jail, and presented this line-up to the Barclays.

43. Jill Barlcay has already had her identification tainted by the original show-up, as the Plaintiff was the only person in the physical line-up who she had been told was a suspect, and who she had seen individually.

44. Before Jill Barclay left the police station that day, Cummings and Napier learned that Jill Barclay knew four of the other five people in the line-up.

45. Carlotta did not identify anyone from that physical line-up.

46. Cummings and Napier then used this identification to get a "limited warrant" from a magistrate to search the Plaintiff's home and to arrest the Plaintiff for purposes of placing him in more line-ups.

47. However, Cummings and Napier lied to the magistrate issuing the warrant and told him the identification was unequivocal without mentioning the fact that this identification was based on an impermissible show-up and that Jill Barclay knew four

7

of the five filler subjects in the line-up.

48. Cummings and Napier then had the Plaintiff arrested pursuant to that warrant, certain evidence was allegedly found that was introduced during the Plaintiff's subsequent trial, and further line-ups were conducted.

49. Cummings and Napier then conducted physical line-ups.

50. None of the eyewitnesses who would testify at trial, other than the Plaintiff's roommate, Kaidi Harvell, testified they knew the Plaintiff prior to the shooting.

51. Those who participated in the physical line-ups and who later would testify at trial were Damonn Nunn, Jill Barkley, Jackie Barkley, Latonia Young, and Carla Goree.

52. As to these physical line-ups, all of them were conducted by Cummings and Napier, and all of them were impermissibly and unduly suggestive, the reasons for which are too detailed and numerous to set forth in this complaint.

53. Any and all eyewitness testimony that was ultimately presented at the Plaintiff's trial was based on the tainted identification procedures employed by Cummings and Napier.

54. On May 16, 1994, Madison County Prosecutor William Lawler Jr. dismissed all charges against the Plaintiff after considering all the circumstances surrounding the case, including the fact that the Plaintiff and his attorney presented a list of 16 alibi witnesses.

55. The dismissal of the Plaintiff's case left Cummings and Napier angry and frustrated.

56. In fact, upon information and belief, this dismissal was at least, in part, the motivation for Cummings to take the extraordinary step of running for election as county prosecutor against Lawler in the upcoming election, and, that same year, Cummings,

the former lead detective on the Plaintiff's case, now became the Madison County Prosecutor.

57. In 1994, Cummings defeated Lawler in an election to become the Madison County Prosecutor, and made it his mission to re-file charges against the Plaintiff.

58. Cummings took office on January 1, 1995.

59. Cummings would later criticize Lawler for his decision to dismiss the Plaintiff's case, publicly stating, Lawler "didn't have the courage" to try the case.

60. Cummings did not understand that the role of a prosecutor is to do justice, not just to win cases.

61. Cummings decided to win at all costs, and this included engaging in intimidation, and continuing to withhold evidence that he originally withheld from the Plaintiff and his attorney.

62. Cummings, the lead detective on the original case, also either withheld all of the exculpatory and/or impeaching evidence later referred to in this complaint from Lawler, or, he did tender this evidence to Lawler, and Lawler, knowing those reports destroyed any case against the Plaintiff, dismissed the case against the Plaintiff before tendering them to the Plaintiff and his attorney.

63. Knowing no other prosecuting agency would have ever prosecuted the Plaintiff, on April 7, 1995, Cummings took the matter in his own hands, and re-filed the original murder and attempt murder charges against the Plaintiff, and at the same time Cummings added charges of attempt robbery and attempt carjacking.

64. As a result, on April 11, 1995, the Plaintiff was re-arrested in St. Louis, Missouri, and taken back to Madison County.

65. Cummings, now Madison County Prosecutor, had a serious conflict of interest, having been the lead detective on the case while an Anderson police detective.

66. Cummings had voluntarily withdrawn as prosecutors from other murder cases where he was the assigned detective, but Cummings refused to do so in the Plaintiff's case.

67. Despite this conflict of interest, Cummings was set to actually try the Plaintiff's case as the lead prosecutor, and he even objected when the Plaintiff's attorneys filed a motion to have him recused from the case.

68. The court ultimately ruled Cummings was required to recuse himself from the case, but other prosecutors in Cummings' office tried the case, namely Madison County deputy prosecutors David Puckett and Paula Maras-Roberts.

69. By any reasonable ethical standard, Cummings should have never filed charges, or at least should have recused his office once charges were filed.

70. Cummings did not do so, later explaining, "I was too scared no one would try it because it was such a tough case."

71. At trial, according to the Seventh Circuit Opinion in *Goudy*, *supra* "the Opinion"), Nunn and Jill Barclay, the passengers in McCloud's car, testified against the Plaintiff.

72. According to the Opinion, Nunn testified he was in the front seat and shot several times.

73. According to the Opinion, Jill Barclay testified she was in the back seat, but was not wounded.

74. According to the Opinion, Both testified that McCloud pulled into a parking lot near an after-hours hangout and picked up Jill Barclay.

75. According to the Opinion, they told the jury that as McCloud pulled out of the lot, the



Plaintiff and a shorter accomplice approached on either side of the car and fired several shots, killing McCloud.

76. According to the Opinion, both testified the Plaintiff was the man on the passenger side of the car.

77. According to the Opinion, Nunn testified the Plaintiff wore a brown or beige corduroy jacket, was around five feet eight to five feet inches tall, had an Afro style hairstyle and wore a cap on his head.

78. According to the Opinion, Jill Barclay testified the Plaintiff wore a dark sweatshirt.

79. According to the Opinion, both Nunn and Jill Barclay testified they witnessed the Plaintiff and three other men earlier in the evening at a nearby club called the Oasis.

80. According to the Opinion, Jackie Barclay, Jill's sister, and LaTonya Young testified they witnessed the shooting from across the street.

81. According to the Opinion, Jackie Barclay and Young testified they had also been at the Oasis that night and both said they saw the Plaintiff and three other men.

82. According to the Opinion, After the Oasis closed, Jackie Barclay and Young testified they went to an afterhours club.

83. According to the Opinion, Jackie Barclay testified she was talking with some friends outside the club when she saw the Plaintiff and another man approach McCloud's vehicle.

84. According to the Opinion, Jackie Barclay testified the Plaintiff was around six feet tall and wore a dark jacket, dark pants or jeans and had braids in his hair that were partially covered by his hood.

85. According to the Opinion, Jackie Barclay testified the shooter on the driver's side was

11

shorter, wore a "brown uniform" and had no facial hair.

86. According to the Opinion, Young testified the Plaintiff was the shooter on the driver's side, that he was around five feet eight inches tall with braids and ponytail and wore no hat or hood.

87. According to the Opinion, A roommate of the Plaintiff, Kaidi Harvell, testified he had been with the Plaintiff on the night of the shooting.

88. According to the Opinion, Harvell testified that he, the Plaintiff and the Plaintiff's two brothers, Romeo Lee and Lamont Thomas drove up from Indianapolis together that night to go to some bars.

89. According to the Opinion, Harvell testified that he and Thomas were instructed to drive around the block while the Plaintiff and Lee were at the Oasis, and headed to an afterhours club, and that the Plaintiff and Lee planned on stealing McCloud's car.

90. According to the Opinion, Harvell testified that the Plaintiff shot into the driver's side of McCloud's car, and that he wore a brown "prison coat," black cap and gloves.

91. According to the Opinion, Harvell testified Lee shot into the passenger side.

92. Harvell testified that while he was testifying under a grant of immunity, he was not testifying pursuant to any deal with Cummings' office.

93. In fact, Harvell was testifying pursuant to a deal with his office, and Cummings knew it, but failed to disclose this information to the Plaintiff and his attorney.

94. In 1997, after the Plaintiff was convicted, Harvell entered a guilty plea to assisting a criminal and was sentenced to two years in prison.

95. Harvell, who according to witness statements contained in police reports that were never tendered to the Plaintiff and his attorneys before the Plaintiff's trial shot and

killed McCloud, cannot now be tried for McCloud's murder, having struck a deal with Cummings to plea guilty to a the much less significant crime of assisting a criminal.

96. At trial, the Plaintiff presented several alibi witnesses who testified that the Plaintiff was hosting a party at the time of the shooting.

97. The witnesses for the prosecution and the defense were able to recall the date because it was "Circle City Classic" weekend in Indianapolis.

98. Before trial, Cummings and Napier had in their possession three police reports that they willfully and wantonly withheld from the Plaintiff and his attorneys.

99. Before trial, Lee confessed to the shooting, but this confession was not introduced at the Plaintiff's trial, in part because Cummings charged Lee with murder, and refused to grant Lee immunity when he attempted to testify on the Plaintiff's behalf at trial, thus causing Lee to invoke his Fifth Amendment right, and the court striking Lee's testimony.

100. Shortly after gaining a conviction of the Plaintiff, Cummings used Lee's confession and the same evidence of the Plaintiff's alleged guilt to convince a different jury that Lee was guilty, and Lee still is imprisoned to this day.

101. Cummings' decision to prosecute Lee is what ultimately led to the withheld police reports being discovered.

102. During Lee's jury trial, sometime between October 14, 1997 and October 23, 1997, Lee's attorney, Sharon Carroll Clark, on her own discovered the existence of additional police reports, then successfully moved the court to force Napier and Cummings to acknowledge, for the first time, the existence of three police reports that

were known to Napier and Cummings since when they were first created (two of them were authored by Cummings on March 31, 1994, and one of them was authored by Napier and Cummings on September 1, 1994).

103.   Napier and Cummings knew of the existence of these reports since they were authored, knew they were exculpatory and/or contained impeaching material favorable to the Plaintiff, yet withheld such evidence until their discovery by attorney Clark in 1997, two years after the Plaintiff was convicted and sent to prison.

104.   According to the Opinion, these three police reports outlined statements by Jill and Jackie Barclay, Young, Harvell, and another witness (who did not testify at trial) named Donzatta Clay.

105.   According to the Opinion, the first withheld report describes a phone call to police from Jill Barclay in which she said she saw one of the gunmen at an Indianapolis mall.

106.   According to the Opinion, Jill Barclay further stated in that report that she thought this man kept looking at her "over his shoulder" and that she later saw him outside "attempting to look at her license plate."

107.   According to this withheld police report, Jill Barclay later identified this man as Harvell and she was positive he was one of the gunmen, the Opinion states.

108.   According to the Opinion, the withheld report additionally describes a photo line-up viewed by the Barclay sisters and Young.

109.   According to this withheld report, all three witnesses positively identified and without hesitation identified Harvell as the gunman on the driver's side of McCloud's car, and said he wore brown clothing, the Opinion states.

110. According to the Opinion, the second withheld police report details an in-person lineup viewed by Nunn, Jill and Jack Barclay, and Donzetta Clay.

111. In that second withheld police report, Clay and the Barclay sisters identified Harvell as the shooter, and Nunn identified a non-suspect as the shooter, the Opinion states.

112. According to the Opinion, the third withheld police report contains a short statement from Harvell indicating that he had been in contact with one of the Plaintiff's alibi witnesses, and he says he "talked with" her and that she "wants to change her story."

113. This third police report would have allowed the Plaintiff to raise the inference that this witness, who later testified at the Plaintiff's trial that the Plaintiff was presenting a false alibi, was recanting her alibi only after being convinced by Harvell, her long-time friend and the actual killer, to do so.

114. The police reports, in addition to the information that Harvell was testifying pursuant to a plea agreement, were withheld from the Plaintiff and his attorneys intentionally, willfully, wantonly, and/or unreasonably, although the Plaintiff in no way admits that any particular mental state is a necessary element of a due process claim.

115. The police reports that were withheld from the Plaintiff and his attorneys were material, exculpatory, and/or contained significant impeachment.

116. The withheld evidence resulted in the Plaintiff not receiving a fair trial, and ultimately proximately caused the Plaintiff to be falsely convicted of murder and other serious felonies, and resulted in him spending almost 16 years in prison for a

crime that he did not commit.

117. On December 21, 1995, the Plaintiff was convicted.

118. On January 17, 1996, the Plaintiff's motion for a new trial and to vacate his judgment was denied.

119. On that same date, the Plaintiff was sentenced to 60 years in the Indiana Department of Corrections on the murder charge, and 50 years on the attempt murder charge, to run consecutive,

120. The Plaintiff appealed his conviction on direct appeal to the Indiana Appellate Court, and the Indiana Supreme Court, but his convictions were denied.

121. The Plaintiff first learned of the exculpatory evidence when Clark notified the Plaintiff's trial attorney, Mark Maynard, of the existence and substance of these reports in October of 1997, and Maynard confirmed to her that these reports were never tendered to him before the Plaintiff's trial.

122. The Plaintiff attempted to present this new evidence on direct appeal, but the appellate court ruled the evidence must be presented to the original trial court in a post-conviction petition.

123. The trial court denied the petition, and the Indiana Appellate Court and Indiana Supreme Court affirmed this denial.

124. The Plaintiff then presented his Constitutional claims, some of which are described in this complaint, in a federal *habeas corpus* petition, to the Southern District Court of Indiana, which denied the petition.

125. The Plaintiff then appealed the denial of the Plaintiff's *habeas corpus* petition to the Seventh Circuit Court of Appeals.

126.    On May 3, 2010, the Seventh Circuit Court of Appeals, in *Goudy v. Basinger*, 604
F.3d 394 (7th Cir. 2010), ruled the Plaintiff's Constitutional rights were violated, that
he did not receive a fair trial, and the Court reversed the district court's decision, and
remanded the case to the district court with instructions to grant the Plaintiff's request
for a writ of *habeas corpus*.

127.    The Seventh Circuit also ordered that if the State elects not to retry the Plaintiff
within 120 days, he shall be released from confinement.

128.    On July 12, 2010, the federal district court ordered that the Plaintiff's *habeas
corpus* petition was granted, and that his conviction in the re-filed case was vacated,
and that the Plaintiff must be released from custody within 120 days from May 3,
2010.

129.    On September 3, 2010, the Plaintiff was released from custody.

130.    The Plaintiff's ordeal was not yet over, however, as the re-filed case had not yet
been dismissed.

131.    The Plaintiff then waited in agony for over a year while the special prosecutor
appointed to handle the matter decided whether to dismiss the criminal charges.

132.    Finally, on January 13, 2012, the special prosecutor's motion to dismiss the re-
filed case was granted in the Plaintiff's favor.

133.     The Plaintiff was innocent of the murder of McCloud.

134.    However, as the proximate result of all the aforementioned actions by the
Defendants, the Plaintiff suffered loss of freedom, the loss of gainful employment,
the loss of employment opportunities, the loss of society with his family, including
his two daughters, and he further suffered severe emotional distress, physical injury,

17

and pecuniary damages.

## COUNT I – 42 U.S.C. § 1983 Due Process Claim (Brady Violation)

(Plaintiff v. Defendants Cummings and Napier)

135.    Plaintiff re-alleges what has been previously alleged in this complaint.

136.    Cummings and Napier withheld material exculpatory evidence and/or impeaching

evidence favorable to the Plaintiff, and they did so unreasonably, willfully, wantonly,

and/or intentionally, although the Plaintiff makes no admission that any particular

mental state is a required element of the due process claim.

137.    The withholding of this evidence violated the Plaintiff's Constitutional rights,

including his Fifth, Sixth and Fourteenth Amendment due process and fair trial rights,

and resulted in the Plaintiff being denied a fair trial.

138.    As the proximate result of all the aforementioned actions of Defendants

Cummings and Napier, the Plaintiff suffered significant damages, as stated with more

specificity above.

WHEREFORE, pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff demands

compensatory damages in the millions of dollars against Defendants Cummings and Napier, and

and because they acted maliciously, wantonly or oppressively, substantial punitive damages, plus

the costs of this action, plus attorneys' fees and other and additional relief as this Court deems

equitable and just.

## COUNT II – 42 U.S.C. § 1983 Due Process Claim (Unduly Suggestive Identification Procedures)

(Plaintiff v. Defendants Cummings and Napier)

139.    Plaintiff re-alleges what has been previously alleged in this complaint.

140.   Cummings and Napier created and/or participated in unduly suggestive identification procedures, and they did so unreasonably, willfully, wantonly, and/or intentionally, although the Plaintiff makes no admission that any particular mental state is a required element of the due process claim.

141.   These identification procedures resulted in the tainting of witness testimony, several false identifications of the Plaintiff, and irreparably harmed the Plaintiff's right to receive a fair trial, in violation of the Plaintiff's Fifth, Sixth and Fourteenth Amendment due process and fair trial rights, and resulted in the Plaintiff being denied a fair trial.

142.   As the proximate result of all the aforementioned actions of Defendants Cummings and Napier, the Plaintiff suffered significant damages, as stated with more specificity above.

WHEREFORE, pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff demands compensatory damages in the millions of dollars against Defendants Cummings and Napier, and and because they acted maliciously, wantonly or oppressively, substantial punitive damages, plus the costs of this action, plus attorneys' fees and other and additional relief as this Court deems equitable and just.

## COUNT III – 42 U.S.C. § 1983 Malicious Prosecution Claim

(Plaintiff v. Defendants Cummings and Napier)

143.   Plaintiff re-alleges what has been previously alleged in this complaint.

144.   Cummings and Napier engaged in numerous actions, described in this complaint, that ultimately resulted in the Plaintiff being maliciously and falsely prosecuted for murder and other related charges, in violation of the Plaintiff's Fourth, Fifth, Sixth,

and Fourteenth Amendment rights of the United States Constitution.

145.    In taking these actions, Cummings and Napier acted without probable cause, and
with malice.

146.    On January 12, 2012, all charges against the Plaintiff were dismissed, and the
criminal prosecution ultimately terminated in favor of the Plaintiff.

147.    As the proximate result of all the aforementioned actions of Defendants
Cummings and Napier, the Plaintiff suffered significant damages, as stated with more
specificity above.

WHEREFORE, pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff demands
compensatory damages in the millions of dollars against Defendants Cummings and Napier, and
because they acted maliciously, wantonly or oppressively, substantial punitive damages, plus the
costs of this action, plus attorneys' fees and other and additional relief as this Court deems
equitable and just.

## COUNT IV – Indiana State Law Claim of Malicious Prosecution

(Plaintiff v Defendants Cummings, Napier and Defendant City of Anderson)

148.    Plaintiff re-alleges what has been previously alleged in this complaint.

149.    Plaintiff was falsely and maliciously charged by Defendants Cummings and
Napier with murder, attempt murder, attempt robbery, and attempt car jacking, and/or
these Defendants played a substantial role in the criminal prosecution, even though
these Defendants knew there was no probable cause for these charges to be filed
against the Plaintiff and/or that the prosecution be continued against the Plaintiff.

150.    In taking these actions, Cummings and Napier acted within the course and scope



of their employment with the City of Anderson, and thus the City of Anderson is liable based on the theory of *respondeat superior*.

151.    On January 13, 2012, all charges against the Plaintiff were dismissed, and the criminal prosecution ultimately terminated in favor of the Plaintiff.

152.    As a result of the actions described in this complaint, the Plaintiff suffered damages, described more fully above.

WHEREFORE, Plaintiff demands compensatory damages in the millions of dollars against Defendants Cummings, Napier, and the City of Anderson, plus attorney's fees and costs, and other and additional relief as this court deems equitable and just, and, because Cummings and Napier acted willfully, wantonly and/or oppressively, substantial punitive damages.

### COUNT V – Indiana State Law Claim of Intentional Infliction of Emotional Distress

(Plaintiff v Defendants Cummings, Napier, and the City of Anderson)

153.    Plaintiff re-alleges what has been previously alleged in this complaint.

154.    In taking the actions described in this complaint, Defendants Cummings and Napier acted intentionally, willfully and/or wantonly, and their actions were outrageous and extreme.

155.    In taking the actions described in this complaint, Defendants Cummings and Napier acted within the course and scope of their employment with the City of Anderson, and thus the City of Anderson is liable based on the theory of *respondeat superior*.

156.    As a result of the actions described in this complaint, the Plaintiff suffered extreme emotional distress, described more fully above.

21



WHEREFORE, Plaintiff demands compensatory damages in the millions of dollars against Defendants Cummings, Napier, and the City of Anderson, plus attorney's fees and costs, and other and additional relief as this court deems equitable and just, and, because Cummings and Napier acted willfully, wantonly and/or oppressively, substantial punitive damages.

## COUNT VI – Indiana State Law Claim of Intentional Infliction of Emotional Distress

(Plaintiff v Defendants Cummings and the State of Indiana)

157.    Plaintiff re-alleges what has been previously alleged in this complaint.

158.    In taking the actions described in this complaint, Defendant Cummings acted intentionally, willfully and/or wantonly, and his actions were outrageous and extreme.

159.    In taking the actions described in this complaint, Defendants Cummings and Napier acted within the course and scope of his employment as the elected Madison County Prosecutor, and thus, under Indiana law, the State of Indiana is required to indemnify Cummings for any judgment entered against him.

160.    As a result of the actions described in this complaint, the Plaintiff suffered extreme emotional distress, described more fully above.

WHEREFORE, Plaintiff demands compensatory damages in the millions of dollars against Defendants Cummings, and that the State of Indiana indemnify Cummings for any judgment, which may include attorney's fees and costs, and other and additional relief as this court deems equitable and just, and, because Cummings acted willfully, wantonly and/or oppressively, substantial punitive damages, which need not be covered by the State of Indiana.

## COUNT VI – Illinois State Law- Indemnification

(Plaintiff v. City of Anderson)

161.   Plaintiff re-alleges what has been previously alleged in this complaint.

162.   Defendant City of Anderson is the indemnifying entity for the actions described above that comprise federal claims in this case against Defendants Cummings and Napier, who took their actions while acting under the color of law and in the course and scope of their employment with the City of Anderson.

WHEREFORE, should Defendants Cummings and/or Napier be found liable on one or more of the claims set forth above, Plaintiff demands that Defendant City of Anderson be found liable for any judgment (other than punitive damages) he obtains thereon.

## COUNT VII – 42 U.S.C. § 1983 Conspiracy Claim

(Plaintiff v. Defendants Cummings and Napier)

163.   Plaintiff re-alleges what has been previously alleged in this complaint.

164.   Cummings and Napier engaged in numerous actions, described in this complaint, that ultimately resulted in the Plaintiff being maliciously and falsely prosecuted for murder and other related charges, in violation of the Plaintiff's Fourth, Fifth, Sixth, and Fourteenth Amendment rights of the United States Constitution.

165.   Additionally, Cummings and Napier engaged in numerous actions, described in this complaint, that unfairly tainted the identifications made in this case of the Plaintiff, in violation of the Plaintiff's Fifth, Sixth, and Fourteenth Amendment rights of the United States Constitution.

166.   In addition and/or alternative to the substantive federal claims made in this case, the Plaintiff also alleges that Defendants Cummings and Napier agreed to engaged in

a conspiracy, with each other and/or with other police officers and/or prosecutors to withhold exculpatory and/or impeaching evidence from the Plaintiff and his attorney, and/or to engage in Unconstitutional identifications procedures, all in a conspiracy to convict the Plaintiff for a crime he did not commit, and to deny him a fair trial, in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

167.    As the proximate result of all the aforementioned actions of Defendants Cummings and Napier, the Plaintiff was denied a fair trial, and suffered significant damages, as stated with more specificity above.

WHEREFORE, pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff demands compensatory damages in the millions of dollars against Defendants Cummings and Napier, and because they acted maliciously, wantonly or oppressively, substantial punitive damages, plus the costs of this action, plus attorneys' fees and other and additional relief as this Court deems equitable and just.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

By: _____

Richard Dvorak,
One of the Attorneys for Plaintiff.

Richard Dvorak
THE LAW OFFICES OF RICHARD DVORAK
200 S. Wacker Drive, Suite 3148
Chicago, Illinois 60606
(312) 593-7146 (phone)
(312) 663-9800 (fax)
richard_dvorak@civilrightdefenders.com

Blake Horwitz
The Blake Horwitz Law Firm
39 S. LaSalle Street, Suite 1515
Chicago, IL 60603