UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WALTER GOUDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:12-cv-00161-SEB-TAB |
| | ) | |
| RODNEY J. CUMMINGS in his individual | ) | |
| capacities as an Anderson police detective | ) | |
| and as a Madison County prosecutor, | ) | |
| STEVE NAPIER in his individual capacity | ) | |
| as an Anderson police detective, | ) | |
| CITY OF ANDERSON an Indiana | ) | |
| municipality, | ) | |
| THE STATE OF INDIANA (for | ) | |
| indemnification purposes only), | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFF'S THIRD MOTION FOR SANCTIONS AND
SUPPLEMENTAL MOTION FOR SANCTIONS**

This cause is before the Court on Plaintiff's Third Motion for Sanctions [Docket

No. 161], originally filed on June 1, 2015 and reinstated on December 12, 2016, as well

as Plaintiff's Supplemental Motion for Sanctions [Docket No. 227], filed on July 25,

2016. Plaintiff Walter Goudy filed his lawsuit alleging violations of his rights under

*Brady v. Maryland* by Defendants Steve Napier (in his individual capacity as a police

detective) and Rodney Cummings (in his individual capacities as a police detective and

prosecutor). He alleges that Defendants withheld exculpatory documents from him

during a criminal prosecution culminating in his serving sixteen years of wrongful

incarceration for murder. We assume familiarity with the facts alleged in this civil

1

action, given our September 30, 2013 Entry granting in part and denying in part Defendants' motion for judgment on the pleadings.  We reiterate those facts here only to the extent relevant and necessary to the present issues before us for a ruling.  Plaintiff's motion seeks the imposition of monetary and other sanctions based on the admitted failure of Defendants' attorneys to timely disclose their discovery privilege log as well as an addendum to that log and is further based on various misrepresentations that Plaintiff alleges were made by defense counsel to the Court regarding the circumstances surrounding the creation of the privilege log and Defendants' belated discovery and revelations that had not been previously provided to Plaintiff.  For the reasons detailed below, we <u>GRANT in PART</u> Plaintiff's Third Motion for Sanctions and Supplemental Motion for Sanctions.

## **Factual Background**

### **The Underlying Litigation**

This case arises from a shooting that occurred on October 3, 1993, in Anderson, Indiana.  Two men fired multiple shots into a car occupied by Marvin McCloud, Damon Nunn, and Jill Barclay, killing Mr. McCloud and seriously injuring Mr. Nunn.  Ms. Barclay, who was a passenger in the back seat of Mr. McCloud's car at the time, was not injured and became an eye-witness to the crime.  On December 21, 1995, Plaintiff Walter Goudy was convicted by jury verdict of the murder of Mr. McCloud and attempted murder of Mr. Nunn.  Another individual, Ellis Thomas (a.k.a., Romeo Lee), was subsequently convicted for his role as the second shooter.  A third individual, Kaidi Harvell, pled guilty to Assisting a Criminal relating to his involvement in the crime.

2

After a lengthy appeal process, the Seventh Circuit overturned Mr. Goudy's conviction in 2010, based on a finding that three supplemental police reports had not been turned over to Mr. Goudy's counsel as part of pretrial discovery. Those reports included information regarding Ms. Barclay's and other witnesses' identification of Mr. Harvell as one of the shooters. Mr. Goudy initiated this action following his release from prison against Defendants Steve Napier (in his capacity as detective) and Rodney J. Cummings (in his joint capacity as a detective as well as prosecutor), alleging, *inter alia*, that Detectives Napier and Cummings knew of the supplemental police reports, but wrongfully withheld them from the deputy prosecutors assigned to the case, in violation of *Brady v. Maryland*, and that following Cummings's election as Madison County prosecutor, he continued to withhold the police reports.

Mr. Goudy filed his complaint in this action on February 6, 2012. On March 21, 2012, Attorney Anthony Overholt entered an appearance on behalf of Rodney Cummings to defend him on the claims brought against him as an Anderson police detective, and on behalf of Steve Napier and the City of Anderson. On April 26, 2012, Indiana Assistant Attorney General Betsy Isenberg filed her appearance on behalf of Rodney Cummings in his capacity as a Madison County Prosecutor and the State of Indiana.[1] Mr. Overholt and Ms. Isenberg have represented Defendants respectively in these capacities throughout the time period relevant to Plaintiff's sanctions motions.

**Discovery of Defense Counsel's Failure to Produce Privilege Log**

---

[1] The State of Indiana was subsequently dismissed from the lawsuit.

This litigation has proceeded along a protracted and often tortuous path following Defendants' two-year delay in disclosing a privilege log to Plaintiff during discovery. This lawsuit was filed in 2012 and the disclosure of the privilege log did not occur until February 2015. By then, discovery had long been closed, and Defendants had filed summary judgment motions, to which Plaintiff had responded; the then-scheduled trial date was only a few months away. The existence of Defendants' privilege log and the fact that it had not been provided to Plaintiff came to light only after Defendants sought to conduct a second deposition of Paula Maras-Roberts, who was the lead prosecutor in Mr. Goudy's criminal case, but not a party to this case.

Ms. Maras-Roberts was first deposed on September 4, 2014. At that deposition, she testified that she could not recall whether she had been in possession of the allegedly exculpatory materials that are the subject of this litigation, but testified that if she had received them, she would have disclosed them to Plaintiff. Approximately five months following her first deposition, on February 3, 2015, Defendants issued a subpoena to Ms. Maras-Roberts to appear for a second deposition. On February 13, 2015, Ms. Maras-Roberts by counsel filed a motion to quash that subpoena. In response to the motion to quash, Defendants represented to the Court that their request for a second deposition was based on Ms. Isenberg's having "located a few pages of handwritten notes" after Ms. Maras-Roberts's first deposition that Defendants believed had been authored by Ms. Maras-Roberts. Dkt. 125 at 2. In another submission to the Court, Defendants characterized these notes as "a few needles in a haystack." Dkt. 147 at 4. According to Defendants, these notes appeared to support the defense theory that they had provided all

4

*Brady* material to the trial prosecutors, and therefore, Defendants (either in their capacity as police detectives or Mr. Cummings in his capacity as elected prosecutor) had not in any way improperly withheld the exculpatory documents from Plaintiff's counsel at his criminal trial.

After the notes were referenced in Defendants' briefing on the motion to quash, Plaintiff's counsel emailed defense counsel on February 18, 2015 to request a copy of the referenced pages. Believing that the notes had previously been produced, Mr. Overholt referred Plaintiff's counsel to Defendant's original production of documents made in 2013. Given the large number of pages that had been part of that 2013 production, Plaintiff's counsel reasonably requested that defense counsel specifically identify the pages of notes by reference to their Bates Stamp Number and/or provide them copies in an email. Mr. Overholt responded to this request by attaching copies of the pertinent documents, stating: "As noted below, some of the documents were identified in our privilege log. The other was produced (sic)." Dkt. 141-4 at 2.

Being thus alerted to the existence of a privilege log, Plaintiff's counsel requested in a letter dated March 27, 2015, that defense counsel tender the privilege log referenced in Mr. Overholt's February 18, 2015 email and also asked defense counsel to indicate when precisely the log had been previously produced, along with proof of service. That same day, Mr. Overholt produced via email the privilege log to Plaintiff's counsel that he indicated had been prepared by his paralegal. In fact, the privilege log had never previously been produced to Plaintiff.

After it became apparent that the privilege log had not been previously produced to Plaintiff, Mr. Overholt followed up the production of the privilege log with a letter to Plaintiff's counsel, dated April 2, 2015, recounting the following timeline of events by way of explanation for his failure to recall that he had not previously produced the privilege log and Defendants' written discovery responses to Plaintiff:

September 28, 2012: Plaintiff served a request for production;

October 23, 2012: Defendant requested an extension of time to respond to the discovery requests, including request for production of documents;

October 24, 2012: Plaintiff agreed to extension of time;

November 28, 2012: Defendants filed motion for extension of time to respond to request for production of documents and interrogatories;

November 30, 2012: Court granted motion for extension of time;

January 4, 2013: Defendants send a proposed protective order to Plaintiff's counsel and parties agreed to another week extension on providing responses to discovery requests;

March 22, 2013: Plaintiff's counsel agreed to the terms of the proposed protective order;

March 22, 2013: Defendants' counsel filed protective order;

April 1, 2013: Court approve[d] and sign[ed] a protective order regarding the document production;

March 23, 2013: Defendants produce[d] documents in response to the request for production and note[d] that "[w]ritten responses for the Request for Production of Documents will be forthcoming."

April 18, 2013: Court order[ed] a stay of discovery (Dkt. 72);

September 30, 2013: Court rule[d] on motion to dismiss (Dkt. 75).

Dkt. No. 142-4.  The April 2 letter from Mr. Overholt further provided as follows:

6

> Defendants did not prepare the written discovery responses referred to in the March 23rd letter before the discovery stay was issued.  After the stay was effectively lifted months later, Plaintiff did not ask for the written responses nor did undersigned counsel recall that those written responses had not been produced.  Because Defendants did not prepare the written responses to discovery and because Plaintiff never sought Defendants' compliance with those requests through Fed. R. Civ. P. 37, Defendants did not produce the privilege log.

*Id.*

After it became clear that the privilege log had not previously been provided by Defendants to Plaintiff, the attorneys conferred by telephone.  Plaintiff's counsel requested the tender of the documents referenced on the privilege log, but Mr. Overholt declined to produce them, indicating that he was standing on the privilege assertion.

The Court was first made aware of defense counsel's belated disclosure of the privilege log on April 14, 2015, when Plaintiff filed his first motion for sanctions seeking an attorneys' eyes only review of the documents identified on the privilege log as well as a motion to bar Defendants from using or otherwise referring to the handwritten notes purportedly authored by Ms. Maras-Roberts in any subsequent motions, hearings, or at trial.  In their responses to Plaintiff's motion for sanctions, both Ms. Isenberg and Mr. Overholt submitted affidavits stating that they did not intentionally withhold their written responses and privilege log from Plaintiff and that the only documents withheld in this case were those that they "to the best of [their] knowledge, believed to be privileged." Dkt. 147-1 at 3; Dkt. 147-2 at 2-3.

**April 27, 2015 Hearing on Plaintiff's Original Motion for Sanctions and Motion to Bar Documents**

The Court heard oral argument on Plaintiff's motions for sanctions and to bar use of documents on April 27, 2015.  When asked by the Court to explain how and when the privilege log was created, Mr. Overholt explained that the log had been prepared before the discovery stay was issued and that once the discovery stay was lifted, he "forgot" that the privilege log had never been sent to Plaintiff.  He stated that neither he nor Ms. Isenberg realized that the privilege log had not been produced until the issue arose in connection with Ms. Maras-Roberts's motion to quash.  Mr. Overholt further acknowledged that he and Ms. Isenberg had "had a responsibility to produce the information."  Dkt. 158 at 29-30.

Upon review of Defendants' privilege log, the Court determined that even apart from the issues related to its belated disclosure, the privilege log tendered by Defendants was "substantively insufficient" in that it was so sparse and incomplete that it was impossible to determine what privilege was being asserted as to each document, much less whether the privilege was properly invoked.  *Id.* at 34.  Given the delay along with the obvious deficiencies in the privilege log, the Court found that Defendants had waived any discovery privileges that they may have otherwise properly asserted over the documents and ordered Defendants to turn over to Plaintiff all documents identified on the log.  *Id.* at 38-39.  At the hearing, the Court also ruled that Ms. Maras-Roberts could be questioned about the handwritten notes and whether she authored them in an attempt to authenticate the notes, but warned Defendants that if the documents could not be authenticated, they could not be used at trial.  The Court reserved a decision as to whether

any monetary sanctions for defense counsel's dilatory conduct should be imposed.  *Id.* at 39.

**The Documents Identified on the Privilege Log**

Following the April 27 hearing, Defendants complied with the Court's order and turned over all documents identified on their privilege log – a total of 947 pages – for Plaintiff's review.  Upon review of those documents, Plaintiff discovered that, in addition to the handwritten notes referenced above which Defendants believed "may have" indicated that Ms. Maras-Roberts had possession of the *Brady* material at issue in this litigation before Plaintiff's criminal trial, there were other documents identified as privileged that, both sides agree, conclusively establish that Ms. Maras-Roberts and the other Madison County trial prosecutor, David Puckett, had in fact possessed the exculpatory evidence before Mr. Goudy's trial and failed to turn it over to Plaintiff's defense counsel during the pendency of the criminal action against him.

For example, the third document listed on Defendant's privilege log is a type-written letter authored by Ms. Maras-Roberts on Madison County Prosecuting Attorney letterhead, dated August 6, 1997.  That letter is written to Sharon Clark, counsel for Romeo Lee, and refers to a conversation Ms. Roberts had had with Ms. Clark the previous day in which Ms. Maras-Roberts said she had "briefly reviewed [her] notes from the preparation of the matter of the State of Indiana against Walter Goudy.  It is [her] understanding that the following persons place Kaidi Harvell at the McCloud vehicle as a shooter: Latonia Young, Jill Barclay, and Jackie Barclay."  Dkt. 161-3 at 2.  The letter is signed "Paula Maras-Roberts" and bears both her typed name as well as her handwritten

signature.  Defense counsel concedes that, because this letter was sent to a third party, namely, Ms. Clark, it is not subject to any attorney-client or work product privilege and therefore should not have been included on the privilege log and withheld.[2]

In addition to the letter authored by Ms. Maras-Roberts, the material identified on the privilege log included other documents that Plaintiff believes were relevant to the merits of this case and/or constitute new *Brady* material, including:

- a typed trial outline authored by the prosecuting attorneys that refers to the lineup of Mr. Harvell and the three witnesses who identified him in the lineup;

- a handwritten draft of Ms. Maras-Roberts's opening statement in Mr. Goudy's criminal trial that states "some eyewitnesses [say] Harvell shot at McCloud" and a typewritten draft of the same opening statement that omits this reference;[3]

- a handwritten chart believed to be authored by Ms. Maras-Roberts titled: "Who puts Walter Goudy At Homicide Scene?" with a separate category titled "KH?" wherein the author notes that Jill Barclay, Jackie Barclay, and Donzetta Clay all identify "KH" as well as a notation that Harvell was identified in a lineup and a photo array as a "shooter";

- a typed memorandum authored by Defendant Napier describing his belief that Mr. Harvell was a suspect in the shooting;

- a "To Do" list dated November 14, 1995 with the notation "videos of lineup ?? Still N/A";

- an August 16, 1994 memorandum from Defendant Cummings to the then-Madison County Prosecutor explaining that Mr. Harvell had sought to change his appearance by growing a beard after being notified that he would be involved in an in-person lineup and seeking a court order to prohibit Mr. Harvell from doing so;

---

[2] Defense counsel contends, however, that even though the document should not have been identified as privileged, it was not responsive to Plaintiff's original request for production and therefore still would not have been discloseable to Plaintiff.

[3] The opening statement Ms. Maras-Roberts ultimately gave during Mr. Goudy's criminal trial did not contain any reference to the Harvell lineup or evidence that he shot Mr. McCloud.

- notes from an interview with Mr. Harvell in which he denied knowledge of or participating in the shooting which contradicts his trial testimony that he was present during the shooting and that Mr. Goudy and Mr. Lee were the shooters; and

- notes regarding a possible plea deal on a robbery and/or burglary charge for 6 to 10 years with notations regarding part of the sentence being suspended and/or considered served which contradicts the State's representation at Mr. Goudy's trial that Mr. Harvell was offered no deal in exchange for his testimony.

Dkt. 161 at 11-14.

On June 1, 2015, after reviewing the documents identified on Defendants' privilege log, Plaintiff filed the motion for sanctions that is currently before us, seeking sanctions pursuant to Federal Rule of Civil Procedure 37, 28 U.S.C. § 1927, and/or the Court's inherent power "for the Defendants' bad-faith withholding of material evidence and their intentional and/or reckless misrepresentations to Plaintiff's counsel, to Magistrate Judge Baker, and to this Court, all made in an attempt to cover up their serious litigation misconduct." Dkt. 161 at 15. Plaintiff requests default judgment against Defendants in the underlying litigation, or, in the alternative, an order striking Defendants' summary judgment motions and affirmative defenses. Plaintiff also seeks a ruling allowing the previously dismissed federal malicious prosecution and Section 1983 conspiracy claims to go forward. In addition, Plaintiff seeks an award of attorneys' fees and costs to offset those it has incurred due to defense counsel's multiplication of the proceedings.

**June 30, 2015 Hearing on the Instant Motion for Sanctions**

On June 30, 2015, the Court heard oral argument on the instant motion for sanctions. Plaintiff's counsel were present as were Mr. Overholt and Alexander Will

11

Case 1:12-cv-00161-SEB-TAB   Document 260   Filed 03/22/17   Page 12 of 37 PageID #: 4014

from the law firm of Frost Brown Todd, and Ms. Isenberg and Mr. Arthur, from the Indiana Attorney General's Office. During that hearing, Plaintiff's attorney, Blake Horwitz, requested permission to depose Mr. Overholt and Ms. Isenberg in order to clarify the events that transpired during the time period when the privilege log was being drafted and to explore what he characterized as various inconsistencies among the statements made by defense counsel regarding such events. Mr. Horwitz described defense counsels' position on these issues as a "moving target," particularly with regard to Mr. Overholt's and Ms. Isenberg's level of involvement in preparing the privilege log as well as their personal knowledge regarding the content of the documents identified therein. Mr. Horwitz posited that these depositions of defense counsel were necessary to clarify the facts related to Plaintiff's allegations that they had made fraudulent misrepresentations to the Court.[4]

Following Plaintiff's counsel's argument, Mr. Overholt spoke on his own behalf prior to Mr. Will's addressing the Court. In answer to the Court's inquiry of Mr. Overholt as to whether he had ever reviewed the documents listed on the privilege log, the following colloquy occurred:

MR. OVERHOLT:  When?  Yes, eventually.

THE COURT:  Well, what does that mean?  Before this hearing?

MR. OVERHOLT:  Before this hearing.

---

[4] At the June 30 hearing, Plaintiff's counsel argued that defense counsel made misrepresentations to the Court regarding, *inter alia*, the volume of documents identified on the privilege log; the evidentiary value of those documents; the manner in which defense counsel prepared the privilege log and the level of involvement they had in its preparation; and that the documents identified on the privilege log all fell under the work product privilege.

12

> THE COURT:  But how about during the course of the preparation of the privilege log and the representation at the last hearing that there were just a few documents that mattered?  Had you conducted your own review of those 900 and some documents?
>
> MR. OVERHOLT:  No.  The review of the 947 pages of documents was initially conducted by two people. … The person – the people that did that, and I identified them in my affidavit, were an attorney, Beau Zoeller, and a paralegal named Melissa White.  Those were the people who helped put that log together and reviewed the documents.  My review did not come until much, much later.  As I explained in the affidavit, because of the [discovery] stay, I never went through and reviewed those documents myself before submitting the privilege log to [Plaintiff's counsel] once this issue arose.

Dkt. 189 at 31.  When asked if this reflected his usual practice, Mr. Overholt replied,

"No."  *Id.*  According to Mr. Overholt, it was his usual practice to have an associate and

paralegal conduct an initial review of the documents, which he would review in the form

of the privilege log before it was produced.  He explained that in this case, however,

"because of the stay, and the fact that the log was not completed before it was provided to

[Plaintiff], I didn't do that."  *Id.* at 32.  Thus, Mr. Overholt acknowledged that he had

neither prepared nor personally reviewed the 947 pages on the privilege log before

turning the log over to Plaintiff, nor had he reviewed those pages before the first

sanctions hearing on April 27.  He stated that, had he reviewed the documents themselves

before the privilege log was sent to Plaintiff, he "hoped" he would have recognized that

the letter from Ms. Maras-Roberts to Ms. Clark, which indisputably establishes that Ms.

Maras-Roberts had possession of the exculpatory police reports prior to Mr. Goudy's

trial, "should not have been withheld under the privilege log."  *Id.* at 32.  Finally, Mr.

13

Overholt conceded that through his inattentiveness and dilatoriness he had multiplied the proceedings in this case. *Id.* at 35.

Mr. Will then addressed the Court on behalf of Mr. Overholt and the City Defendants. He denied that defense counsel had been inconsistent in their statements on matters relating to the privilege log, prompting the Court to question him about an exchange on the record that had occurred during the April 27 sanctions hearing when the Court inquired of Mr. Overholt regarding the manner in which he and Ms. Isenberg addressed the privileged documents in this case. The Court had asked whether in jointly preparing the privilege log, Mr. Overholt and Ms. Isenberg made any distinctions among the withheld documents based on the respective capacities of their clients in which they were sued or "was it just sit around the table and look at all the documents, [and ask,] 'Are they privileged?'" Dkt. 158 at 25. Mr. Overholt responded, "I think it's more the latter." *Id.* He subsequently confirmed, "It's more the latter." *Id.* The Court then asked Mr. Will how the "we sat around the table" method is consistent with Mr. Overholt's subsequent representation that an associate and paralegal had actually prepared the privilege log and that he, in fact, had not even reviewed the documents himself prior to responding to the sanctions motion. Dkt. 189 at 47. After some back and forth between Mr. Will and the Court, Mr. Will stated that he did not believe those representations to necessarily be inconsistent, but conceded that "[p]erhaps there may be some – there may be some need to explore what 'sat around the table' meant. Maybe there may be some limited purpose to depose Mr. Overholt and find out what it meant." *Id.* at 50.

14

Mr. Arthur then addressed the Court on behalf of Ms. Isenberg, representing that, like Mr. Overholt, Ms. Isenberg also had not reviewed the documents on the privilege log before they were withheld from Plaintiff.[5]  Dkt. 189 at 59-60.  When asked why Ms. Isenberg did not review the documents, Mr. Arthur answered, "Probably time is the reason, which I understand is not a good reason.  Did she rely upon [Mr. Overholt]?  They discussed it.  They actually did sit around a table and discuss the approach to these documents."  *Id.* at 61.  The Court then asked whether, in truth, an "illusory claim of privilege" had been asserted, given that neither Ms. Isenberg nor Mr. Overholt had actually reviewed the documents that were referenced on the log, making it "sort of a sham assertion of the privilege log."  *Id.*  Mr. Arthur responded, "Not a sham, Your Honor.  It was a work in progress."  *Id.*

At the close of the June 30, 2015 hearing, the Court again reserved a ruling on Plaintiff's motion for sanctions in order to allow various depositions to be conducted, including those of Mr. Overholt, Ms. Isenberg, Ms. Maras-Roberts, and Mr. Puckett, who was another deputy prosecutor on Mr. Goudy's criminal case.  The Court instructed the parties that, once these depositions were completed, Plaintiff could supplement his sanctions motion, if necessary, and Defendants would then be permitted to respond to the supplement.

**Defendants' Supplemental Privilege Log and Other Belated Disclosures**

---

[5] In her subsequent deposition testimony, Ms. Isenberg testified that Mr. Arthur's statement was incorrect and that she did in fact review the documents before joining the privilege log.

15

On May 8, 2015, pursuant to Plaintiff's request that Defendants certify the completeness of discovery after tendering the documents identified on their privilege log as ordered by the Court following the initial April 27 hearing, Defendants tendered a Certificate of Completeness Regarding Plaintiff's First Request for Production of Documents.  That certificate, signed by Mr. Will and Ms. Isenberg, stated that "[t]o the best of Defendants' counsel's knowledge, Defendants have now provided Plaintiff with all documents identified in the privilege log," and "to the best of Defendants' counsel's knowledge and without waiving any objections, Defendants have now provided all documents responsive to Plaintiff's Requests for Production in their possession at this time."

However, in July 2015, defense counsel belatedly disclosed that they had located an addendum to the original privilege log that identified at least some documents that were different from those identified on the privilege log at issue in the April 27 and June 30 hearings.  The addendum had been created by Ms. Isenberg and Deputy Attorney General Heather Wyatt with the intent that it be incorporated into the draft privilege log prepared by Frost Brown Todd, but because the privilege log was never completed, the two draft privilege logs were never merged.  Some of the documents listed on the addendum log had already been produced to Plaintiff as part of Defendants' original document production, but there were others that had not been produced.  Because the Court had previously ordered the disclosure of documents identified in the original privilege log, defense counsel voluntarily provided Plaintiff with all of the previously undisclosed documents in the addendum privilege log.  Neither side has indicated that

16

any document identified on the addendum is directly relevant to the underlying merits of this case or the issues now before us, nor was the delay in production of the supplemental documents prejudicial to Plaintiff.

At Plaintiff's request, on August 28, 2015, Defendants provided their belated written responses to Plaintiff's original document request.  In preparing those responses, Defendants again identified additional documents responsive to Plaintiff's original request that had not been produced, including Defendants' personnel files.  Defendants produced those documents to Plaintiff with their written responses, now more than three years after Plaintiff's request for production.  It does not appear that any of these belated disclosures are actually relevant to Plaintiff's *Brady* claims or the issues currently before the Court.

**Post-Hearing Deposition Testimony**

After much prodding by the Court, the parties finally completed all of their supplemental depositions in July 2016.  The relevant facts gleaned from these depositions are summarized below as follows:

Plaintiff filed his complaint in this action on February 6, 2012.  In late March 2012, Mr. Overholt began reviewing case-related documents from three main sources: (1) the Anderson Police Department's investigative file into the shooting ("the APD file"), contained in one banker's box; (2) the Madison County Prosecutor's Office file from the criminal prosecutions of Plaintiff, Mr. Thomas, and Mr. Harvell ("the MCPO file"), contained in three banker's boxes; and (3) the state court's files from Plaintiff's criminal case.  In early May 2012, Frost Brown Todd's IT staff scanned and uploaded these

documents into the firm's Summation database for storage, coding, and retrieval.  Once uploaded in electronic format, there were approximately 18,000 total pages of records. According to Mr. Overholt, he was not very familiar with the Summation database, but he had been informed that it would be helpful in this case given the large number of documents to be reviewed.  After the APD and MCPO files were uploaded into the Summation database, Mr. Overholt continued his review of the documents through June 2012.

Mr. Overholt met with trial prosecutors, Mr. Puckett and Ms. Maras-Roberts, on June 18 and June 20, 2012, respectively.  According to Mr. Overholt, at the time he met with Ms. Maras-Roberts, he was aware that handwritten notes existed that looked like they may have been created by Madison County prosecutors, but that he did not know whether the notes were authored by Ms. Maras-Roberts.  Mr. Overholt testified that he does not remember asking her about the notes during this meeting.

On September 28, 2012, Mr. Goudy served Defendants with his Requests for Production of Documents by email.  Plaintiff's request sought, *inter alia*, any documents, videos, photographs, etc. regarding the shooting of Mr. McCloud; any such records relating to "the subject matter of the Complaint"; Defendants' personnel files; and any records that "in any way relate to the shooting of [Mr.] McCloud that were not already tendered in response to the above requests." Dkt. 142-3.  After receiving Plaintiff's

document request, Mr. Overholt worked with Frost Brown Todd paralegal, Melissa White, and associate, Beau Zoeller,[6] to begin compiling the documents for production.

Mr. Overholt met with Ms. Isenberg and her co-counsel Ms. Wyatt on November 19, 2012.  At that meeting, Ms. Isenberg and Ms. Wyatt were given the opportunity to review the full, physical APD and MCPO files and were given a disc containing electronic copies of those documents.  According to Ms. Isenberg, the three attorneys also discussed "how [they] were going to have to review the documents to determine whether there was [any] privilege."  Dkt. 228-8 at 37.  Mr. Overholt testified that the eventual review of the privileged documents did not involve Ms. Isenberg and him "[sitting] around a table" together, however.  Dkt. 228-4 at 300.  Rather, Mr. Overholt, Ms. Isenberg, and Ms. Wyatt apparently communicated primarily via email about this case, with fifty-three (53) emails being sent between staff at the Attorney General's office and staff at Frost Brown Todd between October 25, 2012 and January 22, 2013 as the privilege log was being drafted.  Ms. Isenberg testified that, although she knew there was a joint defense being presented as to Mr. Cummings (with Mr. Overholt representing Cummings in his capacity as a police officer and she representing him in his prosecutorial capacity), she never discussed with Mr. Overholt any issues regarding any possible conflict of interest.

---

[6] Mr. Zoeller graduated from law school in May 2012 and was admitted to the bar and authorized to practice law in October 2012, approximately one week after he began reviewing the documents in this case.

Around this same time, Mr. Overholt instructed his associate, Mr. Zoeller, and his paralegal, Ms. White, to begin reviewing the documents for the purpose of preparing a written response to Plaintiff's Requests for Production.  Additionally, Mr. Overholt directed Mr. Zoeller and Ms. White to create "a privilege log … that would result in certain documents being withheld on the basis of privilege."  Dkt. 288-4 at 225; Dkt. 288-6 at 10.  A particular focus for the privilege log was the deputy prosecutors' "attorney work product prepared in preparation for the underlying case or any attorney-client communications."  Dkt. 228-6 at 6.

Ms. White began reviewing the documents in terms of whether they were privileged on November 26, 2012, coding those she viewed as privileged in the Summation database.  Her work occurred on that day,[7] and continued on November 27, December 12, and December 17, 2012.  Dkt. 234-1 at 29-30.  Mr. Zoeller also coded documents as privileged during this time period.  Dkt. 228-6 at 15-16.  According to Mr. Zoeller, Mr. Overholt communicated with him on a daily basis about the progress of the privilege log assignment.  Ms. White and Mr. Zoeller completed the privilege coding on December 17, 2012, and Ms. White used the privilege coding to generate a draft of the privilege log which she sent to Mr. Overholt and Mr. Zoeller via email that same day.  Mr. Zoeller then forwarded the draft privilege log to the Attorney General's office for their attorneys' review and comment.

---

[7] Documents identified as privileged were given a designation in Summation, to wit, a "Y" for "yes," which would then allow the documents to be instantly sorted for review purposes.

Ms. Isenberg received the draft privilege log via email on December 17, 2012.  On January 2, 2016, Mr. Overholt informed Ms. White that Ms. Isenberg was reviewing documents and would be providing additional entries for the privilege log following her review.  According to Ms. Isenberg, she was asserting the privilege on behalf of Mr. Cummings and no one else.  Ms. Isenberg and Ms. Wyatt split up the work of reviewing the APD and MCPO documents for privilege and, after reviewing the draft privilege log and the related documents, they provided Mr. Overholt with a "list of additional documents" in Excel format ("addendum log") that they "wanted included in the privilege log."  Dkt. 234-1 at 31.  The addendum log was sent in two different emails on January 3, 2016 (two working versions of the same spreadsheet).  Defense counsel intended that the addendum log would be "incorporated" into "one final document," before the log was finalized.  However, after receiving the addendum log from the Attorney General's office on January 3, no one at Frost Brown Todd took any steps to incorporate the addendum log or finalize the privilege log at that time.

Mr. Overholt testified that he intended to respond to Plaintiff's document production request in January 2013, but a dispute arose regarding the entry of a protective order that would protect investigative records and confidential information from public disclosure.  According to Mr. Overholt, this dispute delayed the production of the documents until March 2013, which, he contends, also impacted the finalization of the discovery responses and the completion of the privilege log.  Between January 2013 and March 2013, neither defense counsel completed the privilege log or prepared written discovery responses.  Mr. Overholt testified that he cannot remember why the privilege

log was not completed during this period of time, but believes that "the press of other work and other things we were doing in the Goudy case" impacted the finalization of the privilege log.

On March 22, 2013, after the parties finally settled their dispute regarding the protective order, Defendants filed a motion for an agreed protective order on that date. That same day, Plaintiff's counsel sent an email to defense counsel noting that Defendants had not yet responded to Plaintiff's September 2012 request for document production but indicating that Plaintiff intended to proceed with Defendants' depositions on April 2 and 3, 2013.

According to Ms. Isenberg, the next day, March 23, 2013, she and Ms. Wyatt met with Mr. Overholt in his office and had a general discussion about privilege. Ms. Isenberg testified that at that time both her draft of the privilege log as well as Mr. Overholt's draft were incomplete and did not meet the requirements set forth by the Federal Rules of Civil Procedure.

On March 25, 2013, defense counsel provided to Plaintiff the compiled document production, which consisted of more than 3,100 pages of documents from the APD and MCPO files, Bates Stamped 1 through 3277. The cover letter accompanying the documents notified Plaintiff's counsel of defense counsel's intent to submit written discovery responses, stating: "Written responses for the Request for Production of Documents will be forthcoming." Dkt. 141-3. No mention was made in the cover letter about the existence of a privilege log or that documents were being withheld. According to Mr. Overholt, written discovery responses and the privilege log were not produced at

that time because they had not yet been completed and defense counsel was under a "time crunch," given that Plaintiff wanted to proceed with depositions in early April. Accordingly, Mr. Overholt directed that the non-privileged documents be produced along with the cover letter stating that written discovery responses would follow.  Dkt. 228-4 at 229.

The original depositions of Mr. Cummings and Mr. Napier occurred on April 2 and April 3, 2013, respectively.  Defense counsel knew then that they were withholding documents identified on their privilege log and that their privilege log had not yet been provided to Plaintiff.  During those depositions, it came to light that approximately fourteen audio and video recordings from the APD and MCPO files (that were not included on Defendants' privilege log) had not been included with Defendants' document production, although Mr. Overholt testified that he had directed that they be produced. That evidence was subsequently provided to Plaintiff, and Defendants agreed to re-depose the witnesses in order to allow Plaintiff an opportunity to question them about those recordings.

On April 3, 2013, the Magistrate Judge held a pretrial conference and ordered all discovery be stayed, except by agreement and that all case management deadlines then in place would be reset following the ruling on Defendants' then-pending motion to dismiss. The discovery stay extended from April 3 until September 20, 2013, when the Court denied the motion to dismiss.  At the time the Magistrate Judge imposed the stay, Defendants' written discovery responses and privilege log had neither been completed nor provided to Plaintiff.  Mr. Overholt testified that once discovery was stayed, defense

23

counsel did not continue to work on preparing the written responses or privilege log because the discovery stay "was put in place because there was a pending dispositive motion that may have ended the case. Therefore, [he] did not want to spend [a] significant amount of resources working on those discovery issues because it [might] not ultimately be necessary." Dkt. 228-4 at 237-38. Mr. Overholt's cessation of work on the privilege log when discovery was stayed resulted in a failure to "complete a review and make [his] final determination at that time about whether or not those documents were actually privileged." *Id.* at 276.

During the time period when discovery was stayed, between August and September, the parties did address various discovery disputes. For example, they discussed the audio and video recordings from the APD and MCPO files that had not been included with Defendants' document production. Plaintiff's counsel also raised objections to the format of Defendants' March 25, 2013 document production and the fact that the documents were disorganized. Defendants responded to these complaints by letter dated August 6, 2013, explaining that their failure to include the audio and video files was inadvertent, after which those files were promptly produced to Plaintiff.[8] Defendants also explained with regard to the disorganized production complaint that they had provided the files to Plaintiff in the same condition they were in when Defendants received them, informing Plaintiff that they had "produced exactly what was in the police and prosecution files that were provided to [defense counsel], minus those documents

---

[8] As noted above, on October 15, 2013, defense counsel agreed to allow Plaintiff's counsel to redepose Mr. Cummings and Mr. Napier in order to inquire about those audio and video files.

which were privileged." Dkt. 202-8.  Despite the letter's clear reference to privileged documents, it apparently did not alert either party to the fact that Defendants' privilege log had not yet been produced.

On September 30, 2013, the previously-imposed stay was lifted and discovery resumed.  Neither Mr. Overholt nor Ms. Isenberg thought to finalize and serve Defendants' written discovery responses and privilege log at that time, and, despite having been assured by defense counsel before the discovery stay that written responses would be "forthcoming," Plaintiff's counsel did not inquire as to why Defendants had not produced those responses.

Discovery proceeded and, on September 4, 2014, Ms. Maras-Roberts and Mr. Puckett were deposed.  Ms. Isenberg testified that she represented Ms. Maras-Roberts at this deposition despite also representing Mr. Cummings in this litigation and knowing that one of Mr. Cummings's defenses to Plaintiff's *Brady* claims, to wit, that he turned over the exculpatory evidence to the trial prosecutors, could subject Ms. Maras-Roberts, the lead trial prosecutor, to potential disciplinary action and/or ethical sanctions.[9]  Dkt. 228-8 at 87-89.  Ms. Isenberg further testified that while it would have been logical prior to Ms. Maras-Roberts's deposition for her to search for corroborative evidence that might either prove or disprove that Defendants had provided the exculpatory police reports to the trial prosecutors, she was unable to recall whether she ever actually made such a search.  According to Ms. Isenberg, although she provided certain documents (including

---

[9] Plaintiff contends that Mr. Puckett was represented at his original deposition by Mr. Overholt. However, the facts before us do not support that conclusion.

the chronological case study) to Ms. Maras-Roberts to review before her deposition, Ms. Isenberg did not provide any substantive documents for her review because Ms. Maras-Roberts was afraid, due to a health condition, that reviewing such documents would cause her to create false memories prior to providing her testimony.

At Ms. Maras-Roberts's April 4 deposition, she testified that she could not recall whether the Anderson Police Department, and specifically, Mr. Cummings and Mr. Napier, had provided her with the three police reports containing *Brady* material prior to Mr. Goudy's criminal trial.  This portion of Ms. Maras-Roberts's testimony prompted Ms. Isenberg to review substantial parts of the MCPO file, including the documents withheld and listed on the draft privilege log, to determine whether there was any documentary evidence showing that Ms. Maras-Roberts had had possession of those police reports.  During her review, Ms. Isenberg discovered a few pages of handwritten notes referencing the exculpatory police reports.  Ms. Isenberg testified that she assumed the notes had been written by Ms. Maras-Roberts because they appeared to be prosecutor's notes and the handwriting was in a feminine style.

In October or November 2014, Ms. Isenberg shared her discovery with Mr. Overholt and they discussed what to do with the notes.  After reviewing the pages in question, Mr. Overholt viewed the notes as indicating that, prior to Mr. Goudy's criminal trial, Ms. Maras-Roberts did have in her possession the information contained in the police reports that had been withheld from Mr. Goudy's criminal counsel.  Because defense counsel regarded the notes as support for their theory of the case, they changed their position as to their being privileged in order to question Ms. Maras-Roberts about

them.  Ms. Isenberg subsequently asked Ms. Maras-Roberts to submit to a second deposition to permit the parties to inquire about the notes.  Shortly thereafter, Ms. Maras-Roberts retained separate counsel, attorney Ron Waicukauski, who filed the motion to quash discussed above.  The chain of events that followed, which led to the discovery that Defendants' privilege log had never been disclosed to Plaintiff, culminated in the filing of the sanctions motions currently before us.

**Plaintiff's Supplemental Motions for Sanctions**

Plaintiff's Third Motion for Sanctions was filed on June 1, 2015.  Following the supplemental depositions permitted by the Court, Plaintiff filed his Supplemental Motion for Sanctions on July 25, 2016.  These motions are now fully briefed and ripe for ruling.

## <u>Legal Analysis</u>

### I.       **Standard of Review**

Plaintiff has moved for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and/or based on the court's inherent authority.  Rule 37(b)(2)(A) grants the district court discretionary authority to impose appropriate sanctions for violations of discovery orders and the Seventh Circuit has "signaled a willingness to broadly construe what constitutes a court order for purposes of imposing sanctions under Rule 37."  *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 775 n.3 (7th Cir. 2016) (citing *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 n.7 (7th Cir. 1994) (collecting cases); *Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994) (oral directive from court to provide discovery sufficient)).  Although there are no particular factors that a court must analyze in imposing sanctions under Rule 37, courts generally consider "the

frequency and magnitude of the [party's] failure to comply with court deadlines, the effect of these failures on the court's time and schedules, the prejudice to other litigants, and the possible merits of the plaintiff's suit." *Rice v. City of Chicago*, 333 F.3d 780, 784 (7th Cir. 2003) (quotation marks and citation omitted).

"Section 1927 authorizes a court to sanction an attorney who 'multiplies the proceedings unreasonably and vexatiously' by requiring the attorney to 'satisfy personally' the excess costs (including fees) 'reasonably incurred because of such conduct.'" *Boyer v. BNSF Railway Co.*, 824 F.3d 694, 708 (7th Cir. 2016) (quoting 28 U.S.C. § 1927). A court may impose sanctions pursuant to § 1927 upon a showing of subjective or objective bad faith. *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184 (7th Cir. 1992). Subjective bad faith may be established with evidence of malice or ill will and objective bad faith can be shown with evidence of "extremely negligent conduct, like reckless and indifferent conduct." *Id.* at 1185.

The court also "has the inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it, and pursuant to that authority may impose appropriate sanctions to penalize and discourage misconduct." *Ramirez*, 845 F.3d at 776. Sanctions imposed pursuant to the court's inherent authority "must be premised on a finding that the culpable party willfully abused the judicial process or otherwise conducted the litigation in bad faith." *Id.* The Seventh Circuit has made clear that the court's inherent authority "is a residual authority, to be exercised sparingly" and should only be used to sanction conduct "not adequately dealt with" by other rules and statutes.

*Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir. 2002).

## II.    Discussion

On the basis of the extensive record before us, we find that both defense counsel engaged in an ongoing pattern of inattentiveness, neglect, and carelessness throughout the discovery phase of this case that has resulted in a serious expansion and prolongation of this litigation and thus justifies the imposition of monetary sanctions to compensate Plaintiff for the additional costs incurred by him due to the delay and expanded proceedings.  Defense counsels' indifference to their obligations under the discovery rules and procedures began with their failure to timely (and accurately) prepare, complete, and produce their privilege log to Plaintiff in March 2013.  It is undisputed that, during that time, defense counsel knew they were withholding documents, purportedly on the basis of privilege, and yet, despite their assurances to Plaintiff that their written discovery responses would be "forthcoming," they made no mention of their privilege log.  This was in clear contravention of their duty under Federal Rule of Civil Procedure 26(b)(5)(A) to expressly make any claims of privilege and to describe the nature of the withheld materials "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Their neglect was followed by a continued pattern of minimization regarding the nature and extent of the withheld documents and their obfuscation and lack of diligence as well as candor, the

29

combined effect of which was to magnify the discovery process to the detriment and expense of Plaintiff.

Ms. Isenberg and Mr. Overholt resist the imposition of sanctions against them on the grounds that their failure to comply with their discovery obligations was inadvertent – a simple mistake resulting from the five-month discovery stay imposed by the Court shortly after Defendants' initial production of documents.  If that were the extent of defense counsel's failures in this phase of the litigation, we might well agree that the sanction previously issued by the Court, to wit, the required disclosure of the otherwise allegedly privileged documents, based on Defendants' imputed waiver of their claims of privilege over the documents identified in the log, was sufficient.  However, once it came to light, nearly two years later, in February 2015, that Defendants had *never* produced the privilege log, defense counsels' continued failures and indifference to their responsibilities were of a different magnitude, clearly exacerbating the inconvenience and added expense and delays experienced by Plaintiff.

The April 27, 2015 hearing on Plaintiff's original motion for sanctions, which was conducted approximately one month after it was discovered that defense counsel had neither completed nor produced to Plaintiff their privilege log, showed that defense counsel were unable to answer even the most straightforward inquiries of the Court regarding the documents identified on the privilege log.  Despite Mr. Overholt's[10] various representations about the log, including his statement that all of the documents identified

---

[10] At the April 27 hearing, Ms. Isenberg indicated that the statements made by Mr. Overholt should be imputed to her as well.

therein were covered by the work product privilege, were thereafter proven to be untrue –
making them at best disingenuous when first made – because Mr. Overholt has
subsequently admitted that he had not even reviewed the documents identified on the
privilege log until approximately two months thereafter, that is, not until shortly before
the June 30, 2015 hearing, a date that was more than two years after the privilege log
should originally have been produced to Plaintiff.

At the April 27 hearing, Mr. Overholt informed the Court that Ms. Isenberg had
identified one document on the privilege log, to wit, a few pages of handwritten notes
believed to have been authored by Ms. Maras-Roberts, which might support Defendants'
position that the trial prosecutors had possession of the exculpatory police reports before
Plaintiff's criminal trial and that Defendants had thus fulfilled their *Brady* obligations.
Mr. Overholt stated that Defendants therefore needed to re-depose Ms. Maras-Roberts in
order to determine the evidentiary significance of those notes.

Contrary to defense counsel's description of these recently discovered/identified
documents as merely "a few needles in a haystack" that *might* show that the trial
prosecutors were in possession of the exculpatory police reports, it became apparent,
following the disclosure of all the documents identified on the privilege log that were
turned over to Plaintiff pursuant to the Court's order, that the third document identified
on the privilege log was a letter authored by Ms. Maras-Roberts that indisputably
established that the trial prosecutors did in fact have possession of the *Brady* material
before Plaintiff's criminal trial.  This is critical evidence relating to a highly salient fact
on which the underlying litigation arguably might turn.  In addition to the delay and

obfuscations of defense counsel, because the recipient of the letter was clearly a third party, that document clearly was not privileged and should never have been identified as such. Had either Mr. Overholt or Ms. Isenberg made even a cursory review of the documents identified on the privilege log before the April 27 hearing, the evidentiary significance of the Maras-Roberts letter would have been obvious and there would have been no need to pursue a second deposition of Ms. Maras-Roberts in order to confirm that she had had in her possession exculpatory materials that pertain to the issues underlying this litigation.

Had defense counsel come fully prepared to the April 27 hearing, the Court could have gleaned the full nature and impact of their failure to timely serve the privilege log and been able to assess the appropriateness of the claims of privilege as well as to recognize the evidentiary value of the documents in their possession. This would have allowed the Court to make the necessary rulings to get discovery back on track. Instead, discovery information continued to be disclosed by defense counsel in fits and starts over the next several months, eventually necessitating multiple additional depositions in order to nail down and clarify the relevant facts. Defense counsel abdicated their duty to diligently review the evidence in this case, resulting in a multiplication of the proceedings to which both Mr. Overholt and Ms. Isenberg have admitted. Moreover, their significant failings have been made even more frustrating by their seemingly laissez fair responses to the Court's expressions of concern and opposing counsels' stated frustrations.

Sanctions therefore must follow pursuant to 28 U.S.C. § 1927.[11]  Mr. Overholt and Ms. Isenberg clearly did not act with malice or ill will, but such a showing is not a necessary predicate to sanctions under § 1927.  Objective bad faith can be based on evidence of "extremely negligent conduct, like reckless and indifferent conduct." *Kotsilieris*, 966 F.2d at 1185.  Defense counsel's consistent indifference to their discovery disclosure obligations as evidenced by their failure to diligently review their own evidence to determine its significance was both reckless and extremely negligent.  Their inattentiveness and duplicitousness over many months and their lack of candor regarding the extent of their compliance with their discovery requirements when inquired of unreasonably multiplied the discovery process in this case.  Accordingly, Mr. Overholt and Ms. Isenberg shall be required to compensate Plaintiff for the additional costs and fees "reasonably incurred because of such conduct."  *Boyer*, 824 F.3d at 708 (quoting 28 U.S.C. § 1927).  The precise amount of the financial sanctions shall be determined separately by the Court after a review can be conducted of Plaintiff's itemization of its expenses incurred specifically relating to the Third Motion for Sanctions and Supplemental Motion for Sanctions which were necessitated in order for the Court to

---

[11] We acknowledge that defense counsels' conduct might alternatively be analyzed under the requirements of Rule 37, which addresses certain discovery abuses.  However, the sanctions imposed here on defense counsel are not based on their violations of a particular discovery order; rather, for their careless representations to the Court and persistent patterns of indifference to their obligations to diligently review the evidence in their possession, the result of which derelictions was to significantly multiply the proceedings in this case.  Accordingly, we find that § 1927, which specifically applies in situations where attorney behavior, although not violative of any particular rule, "unreasonably and vexatiously" causes delay or increased costs, is the appropriate authority for the actions we have taken here.

address defense counsels' derelictions.  We recognize that Plaintiff's counsel was not entirely without fault for a certain portion of the delay in the course of the discovery being conducted in this litigation.  While it was undoubtedly defense counsels' duty to complete and produce their written discovery responses and privilege log, Plaintiff's counsels' diligence also faltered when they failed to seek an order to compel Defendants' written discovery responses after those responses had not been forthcoming as promised and when they failed to pursue in a timely fashion defense counsels' August 6, 2013 letter, which contained the reference to the existence of privileged documents.  Our determination of the appropriate monetary sanction against defense counsel will thus take into account Plaintiff's part in causing the delay.

Apart from the imposition of a monetary sanction on defense counsel, the evidence before us does not warrant a more serious sanction.  Plaintiff has sought additional sanctions in the form of entry of a default judgment against Defendants, or an order prohibiting Defendants from seeking summary judgment, and/or an order striking Defendants' affirmative defenses.  Such penalties as these would be excessive, out of line with the culpable conduct.  For example, there is no evidence establishing that the named Defendants were involved in or encouraged in any fashion the neglect relating to the privilege log or that any misrepresentations were made by them to the Court such as might justify a merits-based sanction.  While defense counsels' indifference to their obligations has required Plaintiff to undertake additional measures to secure the discovery to which he was entitled, we find no basis to conclude that their dilatoriness was motivated by a nefarious purpose or that they engaged in some form of conspiracy or

34

plan to withhold evidence, as Plaintiff alleges.  In fact, the documents withheld on the privilege log appear to definitively establish that the prosecutors who tried Plaintiff in the state court criminal prosecution actually did have possession of the three exculpatory police reports prior to Plaintiff's criminal trial which they failed to disclose as *Brady* material.[12]  This apparently has been Defendants' position since this litigation first commenced.  We find it implausible, therefore, to maintain that defense that defense counsel intentionally hid documents that explicitly supported their case theory and countered Plaintiff's claims of liability against Defendants.[13]  The more severe sanctions sought by Plaintiff would be disproportionate to nature and extent of the derelictions of defense counsel, and therefore unreasonable.

---

[12] Plaintiff has indicated that certain documents identified on the privilege log are in fact helpful to his case as well, including a handwritten "to do" list that Plaintiff believes indicates that as of November 14, 1995 the trial prosecutors could not locate the video of the Harvell lineup along with a memorandum from Mr. Cummings to the then-Madison County Prosecutor indicating that Mr. Harvell sought to change his appearance by growing a beard after being notified that he would be involved in a line-up.  If Plaintiff believes that either of these documents creates a genuine issue of material fact that will defeat summary judgment, he is, of course, free to use this evidence (as well as any other document identified on the privilege log that he believes is helpful to his case) in response to Defendants' summary judgment motion(s) or at trial, if the case survives summary judgment.  However, these documents do not support further sanctions on Defendants beyond those that have been imposed here.

[13] Plaintiff argues that Ms. Isenberg had a motivation to hide the documents which indisputably establish that Ms. Maras-Roberts had the *Brady* material in her possession before Plaintiff's criminal trial due to her legal representation of Mr. Cummings in his capacity as prosecutor, as well as her representation of Ms. Maras-Roberts at her first deposition.  Plaintiff contends that this joint representation constitutes a conflict of interest because these clients' interests are not aligned in this litigation.  We offer no opinion as to whether this shared representation constituted an actual conflict or whether it warrants its own corrective sanction.  We hold merely that, when viewed in conjunction with the record as a whole, it is not sufficient to prove that Ms. Isenberg acted with malice or ill will with regard to the nondisclosure of discovery.

## III.    Conclusion

For the reasons detailed above, Plaintiff's Third Motion for Sanctions and Supplemental Motion for Sanctions are <u>GRANTED in PART</u>.  Plaintiff is hereby ordered to provide within twenty-one (21) days of the date of this Entry an itemization of additional expenditures incurred by him in connection with the filing of the Third Motions for Sanctions and the Supplemental Motion for Sanctions.  The itemization should include any costs incurred in connection with the additional depositions necessitated by defense counsels' failures. Following the receipt of such submission, the Court will determine the amount of an appropriate monetary sanction.

This collateral skirmish having now been resolved, the parties should return their attentions to the underlying merits of this case.  Counsel are hereby directed to schedule an immediate status conference and case management plan with the Magistrate Judge to get their pretrial preparations back on track and moving towards a final resolution of this litigation.

**IT IS SO ORDERED.**


Date:   __3/22/2017_____                    _____
                                             SARAH EVANS BARKER, JUDGE
                                             United States District Court
                                             Southern District of Indiana

36

Distribution:

Richard  Dvorak
DVORAK LAW OFFICES LLC
richard_dvorak@civilrightsdefenders.com

Alexander Phillip Will
FROST BROWN TODD LLC
awill@fbtlaw.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com

Betsy M. Isenberg
OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

David A. Arthur
OFFICE OF THE ATTORNEY GENERAL
David.Arthur@atg.in.gov

Jeffrey  Segall
THE BLAKE HOROWITZ LAW FIRM, LTD.
jeffsgll@gmail.com

Uma  Bansal
THE BLAKE HOROWITZ LAW FIRM, LTD.
umadevi@gmail.com

Blake Wolfe Horwitz
THE BLAKE HORWITZ LAW FIRM
bhorwitz@bhlfattorneys.com