UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WALTER GOUDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:12-cv-00161-SEB-TAB |
| | ) | |
| RODNEY J. CUMMINGS in his individual | ) | |
| capacities as an Anderson police detective | ) | |
| and as a Madison County prosecutor, | ) | |
| STEVE NAPIER in his individual capacity | ) | |
| as an Anderson police detective, | ) | |
| CITY OF ANDERSON an Indiana | ) | |
| municipality, | ) | |
| THE STATE OF INDIANA (for | ) | |
| indemnification purposes only), | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This cause is now before the Court on the Motion for Summary Judgment [Docket No. 235] filed on September 16, 2016, by Defendants Rodney J. Cummings, in his individual capacity as a police officer, and Steve Napier, in his individual capacity as a police detective, (collectively, "the City Defendants"),[1] and the Motion for Summary Judgment [Docket No. 269] filed on April 11, 2017, by Defendant Rodney J. Cummings, in his individual capacity as a prosecutor. Plaintiff Walter Goudy's cause of action stems

---

[1] The City of Anderson is also a named defendant in this case. However, because Plaintiff has abandoned his state law claims involving the City and has never asserted a *Monell* claim, the City is entitled to judgment. Accordingly, summary judgment is <u>GRANTED</u> in favor of the City of Anderson.

from his conviction for murder and attempted murder following a 1995 jury trial. After a lengthy appeal process, the Seventh Circuit reversed his conviction in 2010, concluding that three police reports implicating another suspect in the crime were not produced to Mr. Goudy's defense attorney. *Goudy v. Basinger*, 604 F.3d 394 (7th Cir. 2010)

Mr. Goudy subsequently initiated this action against Defendants, alleging a number of federal and state claims, many of which were based on the theory that Detectives Napier and Cummings knew of the supplemental police reports, but wrongfully withheld them from the deputy prosecutors assigned to the case, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that following Cummings's election as Madison County prosecutor, he continued to withhold the police reports. However, it has since been established that the deputy prosecutors who prosecuted Mr. Goudy's criminal case did in fact have possession of those police reports before Mr. Goudy's trial, and thus, that those reports were not improperly withheld by Napier or Cummings. Mr. Goudy concedes this fact and no longer pursues a due process claim based on the withholding of the police reports. Mr. Goudy has also abandoned his § 1983 conspiracy claim as well as his state law claims. Summary judgment is therefore granted in Defendants' favor on those claims.

Accordingly, the only remaining claim at issue is Mr. Goudy's due process claim premised upon his assertion that he was subjected to: (1) a *Brady* violation caused by the withholding of newly discovered exculpatory materials; and (2) an improper show-up procedure that denied him a fair trial. For the reasons detailed below, we <u>GRANT</u> Defendants' Motions for Summary Judgment.

## Factual Background

**I.    Background on Plaintiff's Trial and Conviction**

In the early morning hours of October 3, 1993, in Anderson, Indiana, two men fired multiple shots into a car occupied by Marvin McCloud, Damon Nunn, and Jill Barclay, killing Mr. McCloud and seriously injuring Mr. Nunn.  The shooting occurred while Mr. McCloud was in the driver's seat and Mr. Nunn was in the passenger's seat. *Goudy v. State*, 689 N.E.2d 686 (Ind. 1997).  On December 21, 1995, Plaintiff Walter Goudy was convicted of the murder of Mr. McCloud and attempted murder of Mr. Nunn. Because the underlying facts surrounding Mr. Goudy's conviction were previously set forth in detail in the Seventh Circuit's 2010 *habeas* decision, we incorporate those findings here:

> Goudy's conviction was based on the testimony of five eye witnesses.  The five were Damon Nunn, Jill Barclay, Jackie Barclay, LaTonya Young and Kaidi Harvell.
>
> Nunn and Jill Barclay were passengers in McCloud's car.  Nunn was in the front seat and was shot several times.  Jill Barclay was in the backseat, but was not wounded.  Both testified that McCloud pulled into a parking lot near an after-hours hangout and picked up Jill Barclay.  They told the jury that as McCloud pulled out of the lot, Goudy and a shorter accomplice approached on either side of the car and fired several shots, killing McCloud; both testified that Goudy was the man on the passenger side of the car.  Nunn said Goudy wore a brown or beige corduroy jacket, was around five feet eight to five feet ten inches tall, had an Afro hairstyle and wore a cap on his head.  Jill Barclay said Goudy wore a dark sweatshirt, had a jeri-curl hairstyle that was partially covered by the hood from the sweatshirt.  Both witnesses said they saw Goudy and three other men earlier in the evening at a nearby club called the Oasis.

Jackie Barclay, Jill's sister, and LaTonya Young testified that they witnessed the shooting from across the street. Jackie Barclay and Young had also been at the Oasis that night and both said they saw Goudy and three other men. After the Oasis closed, both went to the after-hours club. Jackie Barclay testified that she was talking with some friends outside the club when she saw Goudy and another man approach McCloud's vehicle. She said Goudy was around six feet tall and wore a dark jacket, dark pants or jeans, and had braids in his hair that were partially covered by his hood. The shooter on the driver's side was shorter, wore a "brown uniform," and had no facial hair. LaTonya Young told the jury that Goudy was the shooter on the driver's side, that he was around five feet eight inches tall with braids and a ponytail and wore no hat or hood. Young also testified in court that a recording of Goudy's car alarm was the same alarm she heard in the Oasis parking lot that night.

A roommate of Goudy's, Kaidi Harvell, was the state's primary witness and testified that he had been with Goudy in Anderson on the night of the shooting. He told the jury that he, Goudy, and Goudy's two brothers, Romeo Lee and Lamont Thomas drove up from Indianapolis together that night to go to some bars. Harvell said that Goudy and Lee coveted the tires and rims on McCloud's car and had been talking about "jacking" them. After the group left the Oasis, they headed toward the after-hours club with other locals, where Goudy and Lee planned to steal McCloud's car. According to Harvell, he and Thomas were instructed to drive around the block while Goudy and Lee would steal the car. Harvell told the jury that Goudy shot into the driver's side of McCloud's car, and that he wore a brown "prison coat," black cap and gloves. Lee shot into the passenger side.

In addition to the evidence produced at trial, the government possessed three police reports that outlined statements by Jill and Jackie Barclay, Young, Harvell, and another witness (who did not testify at trial) named Donzetta Clay. The first report describes a phone call to police from Jill Barclay in which she said she saw one of the gunmen at an Indianapolis mall. She stated that she thought he kept looking at her "over his shoulder" and that she later saw him outside "attempting to look at her license plate." She later identified this man as Harvell and said she was positive he was one of the gunmen. The report additionally describes a photo lineup viewed by the Barclay sisters and Young. All three "positively and without hesitation" identified Harvell as the gunman on the driver's side of McCloud's car and said he wore brown clothing. The second police report details an in-person lineup viewed by Nunn, Jill and Jackie Barclay, and Donzetta Clay. Clay and the Barclay sisters identified Harvell; Nunn

identified a non-suspect as the shooter. The third report contains a statement from Harvell indicating that he had been in contact with one of Goudy's alibi witnesses. He says he "talked with" her and that she "wants to change her story."

The government did not disclose any of these statements to Goudy, even though they implicate Harvell and conflict with Harvell's version of events; contradict Young's statement at trial that Goudy was the driver's side shooter, and conflict with Nunn's description of the gunmen.

*Goudy*, 604 F.3d at 396-97.[2]

As noted above, the only claim remaining in this litigation is an alleged due process violation based on Defendants' failure to disclose certain exculpatory evidence apart from the three police reports referenced in the Seventh Circuit's opinion and the City Defendants' use of an improper show-up procedure. We outline the additional facts relating to this claim in the following section:

## III.    The City Defendants' Identification Procedures

On February 5, 1994, Mr. Goudy was picked up by the police at the Oasis after an anonymous caller told the police that her boyfriend saw one of the shooters there. Exh. N (Rodney Cummings Deposition, Part 1) at 112. Upon arrival at the Anderson Police Department, Mr. Goudy was placed in a room with a one-way mirror. At this point, Mr. Goudy was not free to leave the Anderson police station of his own will. Exh. Q at 253.

---

[2] The Seventh Circuit also noted that, in addition to the undisclosed police reports, the jury did not hear a tape-recorded confession given by Mr. Goudy's brother, Romeo Lee, to Mr. Goudy's defense counsel and a private investigator on July 27, 1995. In that statement, Mr. Lee said that he was the passenger-side shooter and Mr. Harvell was the driver-side shooter. Mr. Lee also stated that he and Mr. Goudy were often confused for each other because of their distinct resemblance. Exh. G (Romeo Lee Audio Statement). The reason Mr. Goudy's counsel failed to introduce this evidence at trial is unknown. As the Seventh Circuit recognized, Mr. Lee's confession was likely self-authenticating and thus admissible under Indiana Rule of Evidence 804(b)(3).

Thereafter, Defendant Cummings, in his role as Anderson Police Detective, contacted Jill Barclay and asked her to come to the police department to make an identification. Exh. C (Jill Barclay Trial Testimony) at 173-74; Exh. O (Jill Barclay Deposition) at 124-25. Ms. Barclay testified that Defendant Cummings and his partner Defendant Napier informed her before she was to make the identification that the person they wanted her to view was a suspect in the shooting. Exh. C at 177; Exh. O at 124-26. Ms. Barclay identified Mr. Goudy from the one-person show-up as one of the shooters.[3]

Defendant Cummings testified in his deposition that he conducted the one-person show-up both because Mr. Goudy requested it and because he did not believe that Ms. Barclay would identify Mr. Goudy as one of the shooters and so it would not be an issue. Exh. N at 62-63, 66-67. But he also acknowledged in his testimony that a one-person show-up is an identification procedure that is less reliable than a normal lineup and can in some cases make it more likely that the witness will later pick out that same suspect in future lineup procedures. *Id*. at 60-61, 66-67.

After Ms. Barclay identified Mr. Goudy from the one-person show-up as one of the shooters, Defendants Cummings and Napier showed her a lineup on that same day wherein she knew four of the five "fillers" and she again identified Mr. Goudy. Exh. C at 1,152-1,155. Ten days later, on February 15, 1994, Ms. Barclay was asked to view another lineup and she once again identified Mr. Goudy as one of the shooters. Mr.

---

[3] In his complaint, Mr. Goudy challenged additional line-up procedures used by the City Defendants that he contends were "suggestive." However, he has since dropped those claims and thus we need not address the subsequent line-up procedures used in this case.

Goudy was the only person in common in these three identification procedures. Exh. P (Jill Barclay Suppression Hearing Testimony) at 178, 183-84, 187-88.

At some point in between the show-up and lineup on February 5, 1994 and the second lineup on February 15, 1994, Jill Barclay spoke to her sister, Jackie Barclay, about the identification she had made. Jill told Jackie that the person she identified looked like "John Casey," a local man from their neighborhood. Exh. O at 140-141; Exh. P at 189-190. Jackie subsequently identified Mr. Goudy as one of the shooters.

## IV.    Undisclosed Videotape

Mr. Goudy was originally charged with Mr. McCloud's murder and Mr. Nunn's attempted murder in February 1994 by then-Madison County Prosecutor William Lawler. Those charges were dropped three months later on May 16, 1994. Exh. N at 93. Defendant Cummings and Defendant Napier disagreed with Mr. Lawler's decision to drop the charges against Mr. Goudy. Thereafter, in the fall of 1994, Defendant Cummings campaigned to replace Mr. Lawler as Madison County Prosecutor.[4] Exh. S (Steve Napier Deposition, Part 1) at 21-25. During this time period, on September 6, 1994, Defendant Cummings signed out of the Anderson Police Department Property Room a videotape recording of a September 1, 1994 lineup wherein Jill Barclay, Jackie Barclay, and Donzetta Clay identified Kaidi Harvell as one of the two shooters; this lineup was the subject of one of the three undisclosed police reports described above. *Id.*

---

[4] Defendant Cummings began working as a police officer for the City of Anderson in 1979. In 1990, Defendant Cummings graduated from law school, passed the bar exam, and became a licensed attorney, all while maintaining his employment as an Anderson police officer.

at 147.  The property receipt for the videotape reflects Cummings's signature.  Exh. V
(Rodney Cummings Deposition, Part 2) at 313-14; Exh. V1 (Anderson Police
Department Property Tag).

Defendant Cummings was elected the Madison County Prosecutor and was sworn
in on January 1, 1995.  Exh. N at 92.  After he was elected, Defendant Cummings
selected Defendant Napier to be the liaison officer to the prosecutor's office.  *Id.* at 111.
The liaison officer is the conduit between the prosecutor's office and the police
department and is responsible for ensuring that all police reports get to the prosecutor's
file.  Exh. S at 13-14.  On April 7, 1995, Defendant Cummings personally decided to re-
charge Mr. Goudy with Mr. McCloud's murder and Mr. Nunn's attempted murder and
issued an arrest warrant for Mr. Goudy.  Exh. N at 126-27.

Before Mr. Goudy's trial, his criminal defense attorney, Mark Maynard, filed a
motion requesting the court conduct an in-camera inspection of the prosecution file
because he believed that police reports were being withheld from the defense.  Exh. X
(Mark Maynard Deposition) at 49.  On October 23, 1995, the trial court conducted a
hearing on Mr. Maynard's motion and Maynard explained that he was seeking, among
other things, access to videotapes, including videotapes of lineups, and police reports.
Exh. Y (10/23/1995 Hearing Transcript) at 362-363.  Madison County Deputy Prosecutor
David Puckett, who represented the State at the hearing, cited Indiana case law
exempting police reports from discovery under the work product doctrine.  *Id.* at 365.
Mr. Puckett did not advance the same argument as to videos, however, instead proposing
that Mr. Maynard make arrangements to view the videos at the police station.  *Id.* at 364-

65.  The trial judge ruled that the videos were to be made available but that police reports were not required to be produced.  *Id.* at 367-68.  Mr. Maynard filed a motion to reconsider that ruling, which was heard on November 22, 1995.  Madison County Deputy Prosecutor Paula Maras-Roberts appeared for the State and made the same arguments as Mr. Puckett had advanced at the previous hearing.  Exh. Z1 (11/22/1995 Hearing Transcript) at 389-91.  The court affirmed its prior ruling.  *Id.* at 392.

On that same day (November 22, 1995), Defendant Cummings, then the Madison County Prosecutor, returned the video of the Kaidi Harvell lineup that he had retained previously in his personal possession for more than fourteen months to the Anderson Police Department Property Room.  Exh. V at 313-314.  At 3:36 p.m. that day, the police identification badge number that Defendant Cummings was assigned when he was an Anderson police detective was used to place the videotaped lineup back into evidence. *Id.* at 325.  While Defendant Cummings has acknowledged that it is his signature on the November 22, 1995 property receipt, he has testified that he could not imagine he would have returned evidence to the property room in 1995, and that, in fact, he was not permitted to do so because by that time he was the Madison County Prosecutor and no longer a police officer.  However, he could not offer any explanation for the fact that it was his badge number and signature on the property receipt.  *Id.* at 317, 325.

There is a set of handwritten notes in the record consisting of a "to-do" list, dated November 14, 1995 (approximately one week before the lineup videotape was returned to the property room), which includes the following entry: "videos of lineup ?? still N/A." Exh. FF1 (Handwritten To-Do List).  Ms. Maras-Roberts testified that she may have been

the author of those notes and that "N/A" would mean "not available." Exh. FF (Paula Maras-Roberts Dep., Part 2) at 27-28, 87-89. Ms. Maras-Roberts also testified that she is not aware of any prosecutor ever removing evidence from a police evidence room without a court order and that the removal of evidence from the property room is usually the function of the police. Exh. EE (Maras-Roberts Dep., Part 1) at 57-58. Mr. Puckett similarly testified that checking evidence in and out of a police evidence room is the responsibility of a police officer. Exh. W (David Puckett Dep., Part 1) at 53-54.

It is undisputed that the lineup videotape and property receipts were not provided to Mr. Goudy's defense counsel at trial. Ms. Maras-Roberts and Mr. Puckett were the prosecutors who tried Mr. Goudy's case. Defendant Cummings was not involved in any way in Mr. Goudy's trial. Both Ms. Maras-Roberts and Mr. Puckett testified that they did not recall ever receiving the videotape and that, had they been in possession of the lineup videotape, they would have been required to tender it to Mr. Goudy's defense counsel. Exh. GG (Puckett Dep, Part 2) at 72-73; Exh. FF at 26-27, 110.

Hope Fey, Mr. Goudy's post-conviction attorney, testified by affidavit that she never received a copy of the Anderson Police Department property tag for the videotape and that, had she received that evidence, she would have introduced the document and the videotape into the record. Exh. KK (Hope Fey Aff.). Similarly, Mr. Goudy's appointed counsel for the proceedings before the Seventh Circuit, Andrew Caridas, testified by affidavit that this evidence was not in the record when the Seventh Circuit decided Mr. Goudy's *habeas* case. Exh. LL (Andrew Caridas Aff.).

**V.     Additional Undisclosed Evidence**

Mr. Goudy filed this lawsuit on February 6, 2012. Following our order in April 2015 directing Defendants to turn over to Plaintiff all documents listed on their privilege log as a sanction for their failure to adequately complete and timely disclose the log, Mr. Goudy learned of an additional item of evidence that he contends constitutes additional *Brady* material.[5] Specifically, Mr. Goudy learned of the existence of a set of handwritten notes written by Defendant Napier, and memorializing the first interview that Defendants Napier and Cummings had with Mr. Harvell on June 22, 1994. Exh. HH (Notes from June 22, 1994 Harvell Interview). These notes describe statements made by Mr. Harvell (before he invoked his Fifth Amendment right to remain silent later in the interview) in which he denied ever having been on the scene of the McCloud shooting or having any involvement in Mr. McCloud's murder. His denial contradicts testimony he subsequently gave at Mr. Goudy's trial. *Id.* These notes were never converted into a police report or tendered in any form to Mr. Maynard. Mr. Maynard testified that he would have used the notes to impeach Mr. Harvell's testimony at trial, had they been disclosed. Exh. MM.

## VI.     The Instant Litigation

In its May 3, 2010 opinion, the Seventh Circuit directed the State to refile charges against Mr. Goudy within 120 days or release him from custody. *Goudy*, 604 F.3d at

---

[5] In his statement of undisputed facts, Mr. Goudy also references discovery of a memorandum written by Detective Cummings to then Madison County Prosecutor Lawler describing how Mr. Harvell was growing a beard, in an apparent attempt to escape identification in an upcoming lineup. Exh. M (August 16, 1994 Cummings Memo to Lawler). According to Mr. Goudy, this memorandum is exculpatory evidence showing Mr. Harvell's consciousness of guilt, which was never disclosed to defense counsel before his criminal trial. However, beyond referencing this memorandum in his statement of facts, Mr. Goudy has not put forth any *Brady* argument in this litigation. Therefore, he has waived any such claim. *See Wehrs v. Wells*, 688 F.3d 886, 891 n.2 (7th Cir. 2012) (recognizing that undeveloped and unsupported arguments are waived).

395-96.  The State chose not to refile charges and Mr. Goudy was released from custody on September 1, 2010.  By this time, Mr. Goudy had been in custody for more than fifteen years, ever since Defendant Cummings issued the arrest warrant for him in April 1995.  A special prosecutor was appointed to determine whether Mr. Goudy should be retried, and, on January 13, 2012, the special prosecutor decided not to retry Plaintiff, and all charges against him were dismissed.

Mr. Goudy filed the complaint in this action on February 9, 2012.  Defendants' renewed motions for summary judgment were filed on September 16, 2016 and April 11, 2017, respectively.  These motions are now fully briefed and ripe for ruling.

## Legal Analysis

### I.    Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts

reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

## II.    *Brady* Material

### A.    Applicable Law

To establish a *Brady* violation, a plaintiff must show that: (1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence is material, or, in other words, resulted in prejudice. *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (citation omitted).  Evidence is "suppressed" if it is not disclosed "in time for the defendant to make use of it," and it "was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008).  Evidence is "material" where there is a "reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  In a civil case, such as this, a plaintiff must also show that a particular defendant is liable for the *Brady* violation. *See Ienco v. City of Chi.*, 286 F.3d 994, 998-99 (7th Cir. 2002).

### B.    Harvell Interview Notes

Mr. Goudy contends that the City Defendants are liable under *Brady* and its progeny for failing to produce to the trial prosecutors the notes from their initial interview with Mr. Harvell and for actively covering up the true nature of that conversation.  The City Defendants do not dispute that this evidence is favorable to Mr. Goudy because Mr.

Harvell's statements disavowing having been at the scene of the shooting could have been used to impeach his subsequent trial testimony admitting that he was in fact present and that Mr. Goudy was one of the shooters. Nor is there any dispute that these notes were not provided to Mr. Goudy's defense counsel before his criminal trial.[6] Accordingly, the issues before us here are whether this nondisclosed evidence resulted in prejudice to Mr. Goudy and whether the City Defendants are the individuals responsible for its withholding.

Here, Mr. Puckett, one of the two trial prosecutors, testified by deposition that he is "as certain as he can be" that he knew before Mr. Goudy's trial that Mr. Harvell had initially denied any involvement in the shooting.[7] Exh. GG (Puckett Dep., Part 2) at 33. The City Defendants cannot be held liable for suppression of evidence if one of the trial

---

[6] We note, however, that we are not entirely convinced that the allegedly impeaching evidence contained in the notes, to wit, that Mr. Harvell initially denied being in Anderson on the night of the shooting, was actually "suppressed" for *Brady* purposes because it appears likely that Mr. Goudy's criminal defense attorney could have discovered it through reasonable diligence. *See Carvajal*, 542 F.3d at 567 ("Suppression does not occur when the defendant could have discovered it himself through 'reasonable diligence.'") (quoting *Ienco*, 429 F.3d at 683). There is no evidence that the City Defendants concealed their initial June 1994 interview with Mr. Harvell. To the contrary, that interview was directly referenced by the City Defendants in a September 1994 interview with Mr. Harvell of which defense counsel had notice. In that later interview, Defendant Cummings expressly mentioned interviewing Mr. Harvell in June 1994, stating: "We [the City Defendants and Harvell] had some conversation. You elected at that time not to talk with us; is that correct?" Exh. NN (September 9, 1994 Harvell Interview) at 2-3. Given that it was well-established in June 1994 that a suspect could invoke *Miranda* rights at any point during an interview with police, *Bobo v. Kolb*, 969 F.2d 391, 395 (7th Cir. 1992) (citing *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)), and Defendant Cummings referenced having "some conversation" during the interview where Mr. Harvell invoked his Fifth Amendment rights, it would have been reasonable for defense counsel to have believed more inquiry was required into whether Mr. Harvell had made any statement about his involvement. Had he made such inquiries, this information presumably would have been disclosed.
[7] Ms. Maras-Roberts, the second trial prosecutor, testified that she had never seen the notes before and that, if she had had access to those notes, she would have been required to produce them to the defense. Exh. FF at 46-47.

prosecutors was in fact aware of the exculpatory information. *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015) ("Usually, a police officer's *Brady* obligations are discharged by disclosing material exculpatory evidence to the prosecutor, for it is the prosecutor's responsibility to turn the evidence over to defense counsel."). Although Mr. Goudy argues that Mr. Puckett's testimony is not credible because Puckett is a friend of Defendant Cummings, he offers no other evidence to discredit this testimony. While credibility determinations are generally inappropriate at the summary judgment stage, "the prospect of challenging a witness' credibility is not alone enough to avoid summary judgment." *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998).

Even assuming that the City Defendants withheld the information contained in the Harvell interview notes from the trial prosecutors, namely, that Mr. Harvell denied being in Anderson on the night of the shooting and having any involvement in a murder, they are still entitled to summary judgment on this claim because the suppressed evidence is not sufficiently material to undermine the verdict in Mr. Goudy's criminal case. As discussed above, there can be no *Brady* violation "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. 263, 281 (1999). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Mr. Goudy argues that the prosecution's case against him was so tenuous that the fact that Mr. Harvell initially denied involvement in the shooting was of "crucial

16

importance, especially where the prosecutor in closing argument bragged that Harvell [had] always told a consistent story." Dkt. 286 at 26. We disagree. First, we are not persuaded that the Plaintiff's characterization of the prosecutor's closing argument is accurate. The thrust of the prosecution's closing did not focus on Mr. Harvell's credibility or the consistency of his story, but rather on the corroboration among the eyewitnesses in their identification of Mr. Goudy as one of the shooters. Dkt. 287-29.

More importantly, this is not a case in which Mr. Harvell's testimony was the only evidence tying Mr. Goudy to the crime. Rather, a number of other eye-witnesses also identified Mr. Goudy as one of the shooters, including Damon Nunn, Latonia Young, Jacqueline Barclay, and Jill Barclay. The fact that Mr. Harvell could have been impeached by his initial denial of involvement does not undermine the testimony of these other witnesses. Additionally, these other witness identifications were corroborated by additional evidence at trial, such as Ms. Young's testimony that a recording of Mr. Goudy's car alarm was the same alarm she had heard at the scene of the crime on the night of the shooting. Thus, the fact that the jury may have disbelieved the testimony of Mr. Harvell had they been presented with the fact that he initially denied having been at the scene of the shooting is insufficient to undermine confidence in the verdict.[8] We, therefore, conclude that the withheld evidence was not material for *Brady* purposes.

---

[8] This is particularly true given the nature and context of the brief comments made by Mr. Harvell in which he denied involvement in the shooting. As recorded on the second page of the officer's handwritten notes, Harvell stated: "Walter [Goudy] never let me use his car[.] I can't get to Anderson on my own[.] I didn't kill nobody and don't know of nobody get[ting] killed. [I] haven't been to Anderson since Sept (2nd or 3rd week) at end." Exh. HH at 3-4. These disclosures came at a very early stage of the questioning by the police and likely had limited

## C.    Lineup Videotape

Mr. Goudy also contends that, in violation of *Brady* and its progeny, a videotape of the September 1, 1994 lineup with Mr. Harvell was withheld by Defendant Cummings, initially in his capacity as a police officer and continuing thereafter when he became prosecutor.

First, there is no basis for liability on the part of Defendant Cummings in his capacity as a police officer for withholding the videotape recording of the September 1, 1994 lineup.  According to the police evidence locker logs, Defendant Cummings checked out the lineup video on September 6, 1994, when he was still a police officer. Although Mr. Goudy contends that Cummings must have had a nefarious purpose for checking out the video at that time, this is nothing more than speculation.  In September 1994, the McCloud murder case was still open and unsolved and there has been no showing that it was improper for Defendant Cummings, as a police officer, to check out a video relevant to an open homicide investigation.  Nor was there any obligation at that time for Defendant Cummings in his capacity as a police officer to turn the video over to the trial prosecutors because there were no charges then pending against Mr. Goudy, since those charges were dismissed in May 1994 and not reinstituted until April 1995, after Cummings had been elected prosecutor and was thus no longer an employee of the City.

---

impeachment value because of their brief, unembellished, unexplained nature and because they are the sort of disclaimers typical of criminal suspects when first questioned by law enforcement.

Accordingly, we turn to the issue of whether Defendant Cummings can be held liable in his capacity as prosecutor for withholding the lineup videotape. We conclude that he cannot. It is the trial prosecutors who have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case …." *Kyles*, 514 U.S. at 437. Here, it is undisputed that Prosecutor Cummings had no role in Mr. Goudy's criminal trial—he was not involved in discovery, did not try the case, and was not otherwise involved in the trial. There is also no dispute that the prosecutors who *did* try the case were aware of the fact that the videotape existed. One of the police reports, as Mr. Goudy concedes, which was in the trial prosecutors' possession, disclosed the fact that the lineup was videotaped. The trial prosecutors' knowledge of the video's existence is further evidenced by the "videos of lineup ?? still N/A" note on the November 14, 1995 to-do list authored by Ms. Maras-Roberts. It is clear beyond dispute, therefore, that the trial prosecutors knew of the videotape, whether they ever actually possessed it or not.

Mr. Goudy argues that Prosecutor Cummings is nevertheless liable for withholding the videotape because, by keeping it in his possession from September 6, 1994 to November 22, 1995, he intentionally concealed it from the trial prosecutors, thereby preventing them from accessing it and turning it over to defense counsel. There is no evidence to support this theory, at least not in the record before us. Although Cummings did retain the videotape in his possession for a significant time period (over fourteen months), he in no way concealed that fact. To the contrary, he used his own name to check the video out of the police evidence locker using the ordinary procedures utilized by the Anderson Police Department and then returned the video, again under his

19

own name,[9] weeks before Mr. Goudy's trial began. There simply is no evidence in the record that the trial prosecutors made any attempt to obtain the videotape during that time period, much less that any such attempt was thwarted by Prosecutor Cummings.

In sum, because the trial prosecutors knew of the existence of the videotape, the location of the videotape was not concealed (anyone who went looking for it in the place it was supposed to be, to wit, the police evidence locker, would see that it had been checked out by Defendant Cummings and thus know where to find it), and it was returned to the evidence room prior to the start of Mr. Goudy's trial and thus available for the trial prosecutors to access and timely turn over to defense counsel, there can be no ruling holding Prosecutor Cummings responsible for a *Brady* violation based on his withholding the videotape. Any failure of the trial prosecutors to locate that videotape and turn it over to the defense is not attributable to Prosecutor Cummings.[10]

## III.    Showup Procedure

---

[9] It is true that Defendant Cummings was the prosecutor at the time he checked the videotape back into the evidence room, which Plaintiff argues is an investigatory, not a prosecutorial, function. That is irrelevant for our analysis, however, because our ruling is not based on a finding that Defendant Cummings is entitled to prosecutorial immunity for his actions.

[10] In a prior order in this case, we held that any potential liability for Defendant Cummings in his prosecutorial capacity was limited to the time period between January 1, 1995, when he began his term as Madison County Prosecutor, and April 7, 1995, when he refiled charges against Mr. Goudy, and that he was entitled to absolute prosecutorial immunity for any actions after that date. *Goudy v. Cummings*, No. 1:12-cv-00161-SEB-TAB, 2013 WL 5487355, at *6-*7 (S.D. Ind. Sept. 30, 2013). Mr. Goudy now asks that we reconsider that ruling, given that Defendant Cummings checked the lineup video back into evidence in November 1995, which is an investigative rather than a prosecutorial function for which Cummings is not entitled to absolute immunity. We decline to revisit our prior ruling, given our finding that Defendant Cummings did not improperly withhold or conceal the videotape from the trial prosecutors at any point.

In Count II of Mr. Goudy's complaint, he alleges that the City Defendants subjected him to suggestive line-up procedures thereby depriving him of the "right to receive a fair trial, in violation of [his] Fifth, Sixth, and Fourteenth Amendment due process and fair trial rights." Compl. ¶ 141. Mr. Goudy has since clarified that he challenges only the February 5, 1994 showup identification involving Jill Barkley. The City Defendants maintain that they are entitled to summary judgment on this claim because: (1) the showup procedure did not deprive Mr. Goudy of a fair trial; and (2) it was the trial prosecutors, not the City Defendants, who made the decision to introduce the showup identification at trial, thus breaking the chain of causation between any suggestive showup procedure conducted by the City Defendants and the violation of Mr. Goudy's constitutional rights.

It is well established law that "due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Moore v. Illinois*, 434 U.S. 220, 227 (1977). The suggestiveness of identification procedures is assessed under a two-step test: "First, the court must decide whether the police used an unduly suggestive pretrial procedure in obtaining an identification. … [T]hen the court must determine whether, under all the circumstances, that suggestive procedure resulted in a substantial likelihood of irreparable misidentification." *United States ex rel. Lee v. Flannigan*, 884 F.2d 945, 948 (7th Cir. 1989), *cert. denied*, 497 U.S. 1027 (1990) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)).

Being subjected to a suggestive identification procedure alone does not rise to the level of a constitutional injury, however. *Hensley v. Carey*, 818 F.2d 646, 650 (7th Cir. 1987) ("[T]he defendants could not have violated [the plaintiff's] constitutional rights simply be subjecting him to a lineup which was allegedly unduly suggestive."). Rather, "[t]he rule against admission of evidence from unnecessarily suggestive lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983." *Id.* at 649. Thus, as Justice Stevens put it in *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 406 (7th Cir. 1975), *cert. denied*, 421 U.S. 1016 (1975), "if a constitutional violation results from a showup, it occurs in the courtroom, not in the police station."

Here, we need not delve into an analysis of whether the showup procedure used in this case was unduly suggestive and whether the use at trial of testimony and evidence that was obtained as a result of the showup identification denied Mr. Goudy his right to a fair trial and thus violated due process. Even if we resolved these questions in Mr. Goudy's favor, the City Defendants cannot be held liable on the record before us for any such constitutional violation because the trial prosecutors' independent decision to introduce such evidence at trial constituted the intervening, proximate cause of any constitutional injury suffered by Mr. Goudy. *See Whitlock v. Brueggemann*, 682 F.3d 567, 582-85 (7th Cir. 2012) (recognizing that general tort principles governing causation apply equally to § 1983 claims).

There has been no evidence adduced by Mr. Goudy that the City Defendants hid from the trial prosecutors the circumstances surrounding Jill Barclay's February 5, 1994 showup identification of him or otherwise in any way were involved in or influenced the trial prosecutors' decision to use testimony and evidence gained from that showup identification in his trial. To the contrary, the record is clear that the trial prosecutors knew that Jill Barclay identified Mr. Goudy following a showup procedure, that the prosecutors had sufficient information to make an informed decision about the reliability of that evidence, and that they exercised independent judgment when they chose to introduce such evidence at Mr. Goudy's trial. The trial judge apparently saw no error in this decision as the evidence was admitted. Under these facts, the chain of causation between the alleged conduct by the City Defendants and any constitutional violation was broken. *See Wray v. City of New York*, 490 F.3d 189 (2d. Cir. 2007) ("In the absence of evidence that [the defendant police officer] misled or pressured the prosecution or trial judge [to use or admit testimony regarding an unduly suggestive identification], we cannot conclude that his conduct caused the violation of [the plaintiff's] constitutional rights; rather, the violation was caused by the ill-considered acts and decisions of the prosecutor and trial judge."). The City Defendants are thus entitled to summary judgment on Mr. Goudy's due process claim based on the showup identification procedure.

**IV.    Conclusion**

For the foregoing reasons, Defendants' Motions for Summary Judgment are

GRANTED.  Final judgment shall be entered following the Court's resolution of the

remaining sanctions issues.

IT IS SO ORDERED.


Date: _____9/29/2017_____                 _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Richard  Dvorak
DVORAK LAW OFFICES LLC
richard_dvorak@civilrightsdefenders.com

Alexander Phillip Will
FROST BROWN TODD LLC
awill@fbtlaw.com

Amy Stewart Johson
FROST BROWN TODD LLC
asjohnson@fbtlaw.com

Anthony W. Overholt
FROST BROWN TODD LLC
aoverholt@fbtlaw.com

Bryan  Findley
INDIANA ATTORNEY GENERAL
bryan.findley@atg.in.gov

Gregory P. Gadson
INDIANA ATTORNEY GENERAL
gregory_gadson@yahoo.com

Gregory P. Gadson
INDIANA ATTORNEY GENERAL
gregory_gadson@yahoo.com

Rebecca L. Loeffler
INDIANA ATTORNEY GENERAL
rebecca.loeffler@atg.in.gov

Betsy M. Isenberg
OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

Jeffrey  Segall
THE BLAKE HOROWITZ LAW FIRM, LTD.
jeffsgll@gmail.com

Uma  Bansal
THE BLAKE HOROWITZ LAW FIRM, LTD.
umadevi@gmail.com

Blake Wolfe Horwitz
THE BLAKE HORWITZ LAW FIRM
bhorwitz@bhlfattorneys.com